JAMES H. HOLL, III (CA Bar No. 177855)
jholl@cftc.gov
Attorney for Plaintiff
COMMODITY FUTURES
TRADING COMMISSION
1155 21st Street, N.W.
Washington, D.C. 20581
 (202) 418-5311 / (202) 418-5523 (fax)

# THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,**<br><br>Plaintiff,<br><br>v.<br><br>**DAVID CARMONA (a/k/a/ David Segundo Carmona a/k/a Wuilver Segundo), JUAN ARELLANO PARRA, MOSES VALDEZ, DAVID BREND, and MARCO A. RUIZ OCHOA, jointly d/b/a ICOMTECH,**<br><br>Defendants. | **Case No. 2:23-cv-04015**<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALITES, RESTITUTION, AND OTHER EQUITABLE RELIEF UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS** |

Plaintiff, Commodity Futures Trading Commission ("CFTC" or "Commission"), an independent federal agency, by its attorneys, alleges as follows:

## I.   <u>SUMMARY</u>

1.     This case involves a fraudulent solicitation scheme targeting Spanish-speaking communities in the United States and other countries.  From at least August 2018 through at least December 2019 (the "Relevant Period"), Defendants David Carmona (a/k/a/ David Segundo Carmona a/k/a Wuilver Segundo) ("Carmona"), Juan Arellano Parra ("Arellano"), Moses Valdez ("Valdez"), David Brend ("Brend"), and Marco A. Ruiz Ochoa ("Ruiz"), individually and jointly doing business as "Icomtech", and each aiding and abetting each other, (collectively, "Defendants"), engaged in a multi-level marketing scheme involving the fraudulent solicitation of customer funds through false representations.

2.     To induce actual and prospective customers to give them money, Defendants and other Icomtech agents falsely represented:  (1) that they would use customer money to trade Bitcoin and other digital asset commodities on the customers' behalves; (2) that Icomtech would provide "daily returns" on the customers' money from the trading of Bitcoin or other digital asset commodities of between 0.9% to 2.8%; (3) that Icomtech would double the customers' money in approximately four to eight months from the trading; and (4) in exchange for a customer's upfront payment of money to Icomtech (typically in cash), that Icomtech would create an online account for the customer where the customer purportedly could watch their money grow.

3.     In actuality, Defendants did not trade Bitcoin or other digital asset commodities on the customers' behalves as they represented, and did not earn daily returns nor double the customers' investments based on trading.  Instead, Defendants misappropriated customer funds to further promote the scheme, and, on information and belief, to pay for personal expenditures and to pay themselves commissions and bonuses.  In fact, some Icomtech customers lost all of their funds.

4.     As further inducement for customers to give them money, Defendants falsely promised existing customers that they would receive commissions and/or bonuses for referring family and friends to Icomtech.  Based upon those representations, some customers accepted money from family and friends on behalf of Icomtech and then gave the money to Defendants or other Icomtech agents for Icomtech purportedly to trade Bitcoin and other digital asset commodities on the customers' behalves.  In actuality, despite referring family and friends to Icomtech, one or more Icomtech customers did not receive commissions and/or bonuses for those referrals as Defendants had promised.

5.     Finally, the Icomtech written promotional materials that Defendants and other Icomtech agents provided to customers did not disclose, or did not fully disclose, that customer money would be used to, at least in part, pay for Icomtech expenses or Defendants' and other Icomtech agents' commissions and bonuses.

6.     As a result of Defendants' fraudulent scheme, more than 170 individuals located in the United States and other countries transferred at least hundreds of

thousands of dollars to Defendants and other Icomtech agents.  During and after the

Relevant Period, numerous customers unsuccessfully attempted to withdraw money

from their Icomtech accounts.  Rather than return money to customers, certain

Defendants made excuses and reassured customers that their money was safe.

Despite the assurances, some customers lost all of their money.

7.     By this conduct and the conduct further described herein, Defendants

have engaged, are engaging, or are about to engage in fraudulent acts and practices in

violation of Section 6(c)(1) of the Commodity Exchange Act (the "Act"), 7 U.S.C.

§ 9(1), and Commission Regulation ("Regulations") 180.1(a)(1)-(3), 17 C.F.R.

§ 180.1(a)(1)-(3) (2022).

8.     Further, during the Relevant Period, each of the Defendants willfully

aided and abetted each of the other Defendants' fraudulent acts and practices and,

therefore, are liable for that fraud pursuant to Section 13(a) of the Act, 7 U.S.C.

§ 13c(a).

9.     Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the

Commission brings this action to enjoin Defendants' unlawful acts and practices and

to compel their compliance with the Act and Regulations, and to further enjoin

Defendants from engaging in any commodity interest or digital asset-related activity.

Additionally, the Commission seeks civil monetary penalties, restitution,

disgorgement of Defendants' ill-gotten gains, and ancillary remedial relief, including,

but not limited to, permanent trading and registration bans, rescission, fees and costs,

pre-judgment and post-judgment interest, and such equitable relief as this Court may deem necessary or appropriate.

10.     Unless permanently restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint, or in similar acts and practices.

## II.     JURISDICTION AND VENUE

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331(codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1, provides that United States district courts possess jurisdiction to hear actions brought by the CFTC for injunctive relief or to enforce compliance with the Act whenever it shall appear to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

12.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendants reside in this District, transact or transacted business in this District, and certain transactions, acts, practices and courses of business alleged in this Complaint occurred within this District, among other places.

### III.   **THE PARTIES**

13.     Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and the Regulations promulgated thereunder.  The CFTC maintains its principal office at Three Lafayette Centre, 1155 21st Street NW, Washington, D.C. 20581.

14.     Defendant **David Carmona** is an individual currently believed to be in federal custody (see Paragraph 27 below) who maintains a residence in Elmhurst, New York.  Carmona is also known by the names David Segundo Carmona and Wuilver Segundo.  Carmona has never been registered with the Commission.

15.     Defendant **Juan Arellano Parra** is an individual currently believed to be in federal custody (see Paragraph 27 below) who maintains a residence in Chino, California.  Arellano has never been registered with the Commission.

16.     Defendant **Moses Valdez** is an individual believed to be residing in Hesperia, California.  Valdez has never been registered with the Commission.

17.     Defendant **David Brend** is an individual believed to be residing in Tampa, Florida.  Brend has never been registered with the Commission.

18.     Defendant **Marco A. Ruiz Ochoa** is an individual believed to be residing in Nashua, New Hampshire.  Ruiz has never been registered with the Commission.

# IV.   FACTS

## A.   Background.

19.   "Icomtech" was created by Carmona, Ruiz and other Icomtech "founders."

20.   Icomtech is not and was not during the Relevant Period registered as a business entity in the United States.

21.   Throughout the Relevant Period, Defendants did business and operated and marketed Bitcoin and other digital asset commodity trading, among other things, to U.S. persons under the name Icomtech.

22.   Certain digital assets, including Bitcoin, Ether and USDC, are "commodities" in interstate commerce.

23.   Carmona, Valdez, Arellano, and Ruiz, among others, were Icomtech's "Main Leaders", and the website www.icomtech.org identified Valdez and Brend, along with their picture, as part of the Icomtech "TEAM".

24.   Icomtech promotional material posted to the internet in 2019 claimed Icomtech was a company "with the mission to create the largest exchange in the world" for the purposes of buying and selling cryptocurrency, including Bitcoin.  The promotional material claimed Icomtech's goal was to become like other major cryptocurrency exchanges, including Coinbase, Binance and Bitmex, and touted Carmona as someone who had made a fortune trading cryptocurrency, including Bitcoin.

25.     Other Icomtech promotional materials posted to the internet pitched Icomtech as "a technological institution based on Bitcoin," and/or encouraged customers to "be part of this revolution of transactions in Bitcoin" through, at least in part, trading Bitcoin through Icomtech.

26.     As described below, throughout the Relevant Period, Carmona, Arellano, Valdez, Brend and Ruiz, individually as well as jointly doing business as Icomtech, all fraudulently solicited customers and prospective customers, including U.S. persons, to give them money for Icomtech to trade Bitcoin and other digital asset commodities on the customers' behalves.

27.     On October 13, 2022, Defendants Carmona, Arellano, Valdez, Brend and Ruiz were indicted for wire fraud in connection with the Icomtech scheme. Indictment, *United States v. Carmona,* 1:22-cr-00551-JLR (S.D.N.Y Oct. 13, 2022), ECF No. 2.

**B.     Icomtech Websites.**

28.     During the Relevant Period, Icomtech had two websites associated with its business operations, "icomtech.io" and "icomtech.org."  The websites were identified in Icomtech written promotional materials.

29.     Once the customer paid the Icomtech agent who had solicited them cash or transferred money by other means, an Icomtech agent created an online account for the customer through the Icomtech websites, issued the customer a user ID and

temporary password, and emailed the customer a link with a user ID and temporary password.

30.     Thereafter, customers could access their account information by logging in through the Icomtech websites.  Through the websites, customers could, among other things, access their account information, including account statements, and could check the supposed value of their accounts, including purported earnings from Defendants' supposed trading on their behalves.

31.     Once logged into the "icomtech.io" website, the "my.icomtech.io" "Dashboard" page showed the customer his or her purported "Total Earning[s]" and provided the customer a link to his or her individual account(s) statement.  During the Relevant Period, customers routinely accessed and used the account statements to track their purported earnings from Defendants' supposed trading on their behalves.

32.     The "icomtech.org" website also allowed customers to log into their account and perform multiple account-related functions through either the website or a Smartphone app.  Under a section titled "Smartphone," the website stated:

> Imagine the possibility of being able to generate earnings from your smartphone wherever you are, whenever you want. Our application will allow you to:  •Edit your profile •Register new members •Review your earnings •Request withdrawal of your cryptocurrencies.

33.     Customers generally were told that they could withdraw their funds through the website or a Smartphone app beginning six months after deposit or after a minimum amount of $150 in earnings had accumulated.

## C.    Defendants' Misrepresentations and Omissions Regarding Bitcoin and Other Digital Asset Commodity Trading.

34.    During the Relevant Period, Carmona, Valdez, Arellano, Brend and Ruiz, individually as well as jointly doing business as Icomtech, fraudulently solicited actual and prospective customers, including U.S. persons, to give them money for Icomtech to trade Bitcoin and other digital asset commodities through Icomtech on customers' behalves via one or more of the following: at in-person meetings – including in customers' homes, at Icomtech promotional events, in Icomtech PowerPoint and other presentations and documents circulated at Icomtech promotional events, via YouTube and other presentations posted to the internet, Zoom meetings, and through word-of mouth.

35.    Defendants and other Icomtech agents represented in these in-person meetings, at Icomtech promotional events and/or in Icomtech promotional material, among other things, that Icomtech would:  (1) trade bitcoin and other digital asset commodities on the customer's behalf; (2) provide daily returns from the trading of between 0.9% to 2.8%; (3) double the customer's money in approximately four to eight months; and (4) customers could use one of Icomtech's websites to create an online account where the customer could watch their money grow.

36.    Defendants and other Icomtech agents predominately directed their solicitations to Spanish-speaking individuals and targeted those communities.

Icomtech written promotional presentations and pitches were in both Spanish and English, although predominately in Spanish.

### i.     **Icomtech Promotional Events**

37.     Icomtech flyers and/or advertisements listed the following dates and locations for Icomtech promotional events:  January 6, 2019 at a restaurant called Luminarias in Monterey Park, California; February 5, 2019 at the DoubleTree Hotel in Commerce, California; March, 2019 at Planet Hollywood, Las Vegas; May 6, 2019 at Luminarias Restaurant, Monterey Park, California; May 15, 2019 at the GrillSmith restaurant in Tampa, Florida; July 28, 2019 at the DoubleTree Hotel in Rosemead, California; September 17, 2019 at the DoubleTree Hotel, Rosemead California; September 18 and 19, 2019 at the Mariscos Puerto Escondido restaurant in Los Angles, California; and September 18, 2019 at the Quiet Cannon conference center in Montebello, California.

38.     In some instances, hundreds of people attended the Icomtech promotional events.

39.     Carmona, Valdez and Arellano, among other Icomtech agents, were specifically identified by name and/or pictured in advertisements for certain of these Icomtech promotional events.  For example:

a.  Carmona was pictured using the name Wuilver Segundo and identified with the title "Co-Fundador Icomtech" (i.e., co-founder Icomtech) in an

advertisement for an Icomtech promotional event dated March 16 (no year specified) at the DoubleTree Hotel in Commerce, California;

b.  Valdez was pictured and identified by name in an advertisement for an Icomtech promotional event dated April 29, 2019 at the DoubleTree Hotel in Norwalk, California;

c.  Valdez was pictured and identified by name in an advertisement for an Icomtech promotional event dated May 6, 2019 at the Luminarias restaurant in Monterey Park, California;

d.  Carmona was pictured and identified by name with the title "Co-Fundador" (i.e., co-founder) in an advertisement for an Icomtech promotional event dated May 19, 2019 at the DoubleTree Hotel in Rosemead, California;

e.  Valdez and Arellano were pictured and identified by name in an advertisement for an Icomtech event dated July 28, 2019 at the DoubleTree Hotel in Rosemead, California; and

f.  Valdez was pictured and identified by name, and Arellano was identified by name, in an advertisement for an Icomtech promotional event dated November 10, 2019 at the DoubleTree Hotel in Rosemead, California.

40.  Upon information and belief, at each of these promotional events, one or more of the Defendants made fraudulent misrepresentations to customers and prospective customers as described in Paragraph 35 above.

41.     Valdez, Arellano, and Ruiz as well as other Icomtech agents organized the conference rooms, hotel rooms, and/or catering or other hotel services for the Icomtech promotional events.  This included, among other things:  (i) Ruiz signing a sales contract and service agreement on behalf of Icomtech with Planet Hollywood in Las Vegas for a March 2019 Icomtech promotional event; (ii)  Valdez ordering and paying a deposit for a conference room and other services on behalf of Icomtech at the Quiet Cannon Montebello conference center in Montebello, California for a May 2019 Icomtech promotional event; (iii) Arellano acting as Icomtech's contact person in connection with an August 24, 2019 Icomtech event at the Quiet Cannon Montebello conference center in Montebello, California; and (iv) Arellano paying a deposit for a conference room at the Quite Cannon Montebello conference center in connection with a September 28, 2019  Icomtech event.

### ii.     Icomtech Solicitations and Promotional Materials

42.     Carmona and Ruiz drafted or assisted in drafting Icomtech promotional material containing fraudulent misrepresentations that were posted on the Internet and/or circulated at Icomtech promotional events.

43.     Valdez hosted a WhatsApp group chat titled "Bitlionaires LA."  The group chat contained links to Icomtech advertisements, meeting notices, presentations and videos.  Some of those advertisements, presentations and videos contained fraudulent misrepresentations.

44. A flyer posted in a Bitlionaires LA WhatsApp chat (Valdez was the administrator for the chatroom) advertising an Icomtech sponsored event to be held on April 2, 2019 at the Double Tree Hotel in Commerce, California, stated:

> Icomtech offers you the opportunity to have your own cryptocurrency business. You can generate thousands of dollars in digital gold, called Bitcoin, through e-commerce, trading, and mining, and thus grow your financial freedom.

45. At least one Icomtech presentation posted to the Bitlionaires LA WhatsApp group chat on June 15, 2019 also included the claim "Double by Trading" and that the money could be doubled in 140 days approximate.

46. Another Icomtech advertisement posted to the Bitlionaires LA WhatsApp group chat also included the phrase "Double by Trading" and lists "140 DAYS APPROXIMATE" next to the word "DOUBLE."

47. Brend used text messages and chats, and a YouTube video to solicit customers. Some of these text messages, chats, and YouTube videos contained fraudulent misrepresentations.

48. Brend claimed in a YouTube video presentation entitled "Icomtech English Presentation 2019" that Icomtech used trading "algorithms." He claimed the algorithms allowed Icomtech to "consistently" generate gains trading Bitcoin and thus "create a standard revenue for us."

49.     Brend also stated in his YouTube presentation entitled "Icomtech English Presentation 2019" that customers' money would "double in roughly between six and eight months."

50.     Carmona and Ruiz also claimed that Icomtech used "sophisticated algorithms" to do the trading.  For example, during an Icomtech promotional  event held in or about January 2019 at "Luminarias" restaurant in Monterey Park, California, they claimed that:

    a.  they were in the business of trading cryptocurrency, and had "robots doing the trading with sophisticated algorithms...."

    b.  a person's initial investment would be doubled within a six-month period;

    c.  the customer would be paid a percentage between .9% to 3% of the original investment on a daily basis;

    d.  the customer's money could be withdrawn in Bitcoin through a bitcoin wallet on a weekly basis once a minimum amount of $150 in earnings was accumulated; and

    e.  through the multi-level marketing referral program, a customer would receive a 20% commission on the investment of anyone referred.

51.     Arellano and other Icomtech agents solicited one California customer in the summer of 2019.  The customer was told during the solicitation, among other

things, that it was easy to make money through Icomtech via daily trading and that the customer's money could be doubled in 120 days.  From the solicitation, the customer understood that Arellano would trade mostly in Bitcoin and other digital asset commodities and generate big profits.

52.     Icomtech promotional presentations and materials also explained that Icomtech offered as many as eight (8) "Packages" that customers could choose to purchase for set amounts ranging from an upfront payment of $300 up to $20,000. Customers purchased packages predominately through cash payments to one or more Defendants or other Icomtech agents.

53.     The www.icomtech.org website contained a chart entitled "Packages" with a listing, by a Package number, of graduated "points" and a "global pool bonus" for higher dollar investment amounts and various percentage ranges associated with profitability.

54.     Brend gave an example of how one "package" worked in his YouTube video presentation entitled "Icomtech English Presentation 2019," and how a customer could make even more money by referring friends and family:

> You can invest here in a package, you can buy a $2,500 package -- I'll give you example, or a $300 package, and ***that will double in roughly between six and eight months***. It depends on the package and what algorithm that you're locked into. The company chooses that when you sign up.  But once you -- let's say you came in and you bought a $1,000 package. That'll make $2,000, but then, you know, a week later you, you had a little more money you got a tax return back. You're like 'let me put in this $2,500 I got for tax return.' So once, ***as soon as you do that you make 20 percent***

***from your own money, because that is your first level***. And then if you decide to ***sign up your aunt or your mom or family member***, and you do that, that person that you sign up below that second package would be your second level ***and that would give you 3 percent, so you get a two-tier system but total you can make on your own money up to 23% or by bringing people in*** . . . .

But all of this is based on trading mainly. We do have some mining values that are coming in here, but most of this is involved in the trading and ***you make about 0.9 to 2.8 percent every single day***, Monday through Friday, and then also on Fridays, you can see that ***you'll actually get an opportunity to withdraw every Friday*** from between 3:00 to 9:00 p.m. Pacific Standard Time." (Emphasis added).

**D.   Defendants Communicated About Icomtech Operations and Coordinated Their Fraudulent Solicitation Activities.**

55.     Using instant messaging and voice-over-IP services and messenger applications, like WhatsApp Messenger, Defendants communicated amongst themselves, and with other Icomtech agents, about Icomtech's operations, customers and solicitations during the Relevant Period.  For example, the Defendants communicated about rates of return, solicitation materials, and how to handle customer money.

56.     Defendants doing business as Icomtech coordinated their solicitation activities, i.e., they often attended and presented at the same Icomtech solicitation events, used the same or similar fraudulent solicitation pitches and materials at those events and in customer meetings, and used the same or similar fraudulent solicitation materials.

**E.    Defendants Did Not Trade Bitcoin or Other Digital Asset Commodities as They Represented and Did Not Earn Daily Returns nor Double the Money.**

57.    Notwithstanding the representations set forth in Paragraphs 32-33, 35, 44-54 above, in actuality, Defendants:  (i) did not trade Bitcoin or other digital asset commodities on the customers' behalves as represented; (ii) did not earn daily returns of between .09% and 2.8% based upon the trading; and (iii) did not double the customers' money based on trading.

58.    Instead, Defendants used customer funds to further promote the scheme, and, on information and belief, to pay for personal expenditures and to pay themselves and other Icomtech agents commissions and bonuses.

59.    Each of the Defendants aided and abetted each of the other Defendants' fraudulent acts and practices set forth in Paragraphs 19 to 58 above.

**F.    Some Icomtech Customers Lost the Full Amount of the Funds They Deposited with Defendants for Trading.**

60.    During the Relevant Period, customers submitted their payments for an Icomtech package to an Icomtech agent via cash, wire transfer, check, money transfer services, and/or a digital asset commodity, specifically, Bitcoin.  Some customers were told that they could only pay in cash.

61.    On information and belief, some of the cash payments by customers were deposited in bank accounts owned by Defendants, or in bank accounts in the name of companies associated with one or more of the Defendants, including True Credit Repair LLC, a company owned by the Brend's wife.

62.     During the Relevant Period, Carmona, Valdez, Arellano, and Brend received customer funds, either directly from customers, from companies associated with certain Defendants, or from other Defendants and Icomtech agents.

63.     For the purpose of Icomtech trading Bitcoin or other digital asset commodities on the customers' behalves:

     a.  At least two Icomtech agents transferred customer funds to Carmona during the Relevant Period via cash, bitcoin transfer, payment processing services such as Zelle, and deposits into a bank account in Carmona's name.

     b.  At least two Icomtech customers gave funds to Arellano during the Relevant Period, including via cash and bitcoin transfer.

     c.  At least one customer, and at least one Icomtech agent on behalf of numerous customers, transferred customer funds to Valdez during the Relevant Period.  On information and belief, Valdez transferred some of those funds to Carmona.

     d.  A number of Icomtech customers and, on information and belief, an Icomtech agent on behalf of Icomtech customers, gave money to Brend, by making payment to him through PayPal, and/or by writing checks to his wife's company, True Credit Repair LLC, a Florida limited liability company.  Brend was a signatory on the True Credit

- 19 -

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION AND OTHER
EQUITABLE RELIEF UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

Repair LLC's bank account into which some Icomtech customer money was deposited.

64.     Customers were generally told that, after six months or after a minimum amount of $150 in earnings accumulated, they could withdraw funds from their accounts on Fridays.  Beginning in the late summer of 2019, some Icomtech customers attempted to withdraw their account balances in U.S. dollars and/or digital asset commodities in accordance with the instructions but found they were unable to do so, with limited exceptions.

65.     A number of customers confronted Carmona and Valdez, as well as other Icomtech agents, about their inability to withdraw their funds, and demanded the return of their money.

66.     Carmona and Valdez, as well as other Icomtech agents, provided purported explanations as to why customers' money could not be immediately withdrawn.  One explanation was that Icomtech was in the process of migrating to a new online system at a new web address.  The transfer to the new website was in or about September 2019.  Customers were told that the migration was progressing slowly and there were technical difficulties in the online transfer, but that the online system was being fixed.  Nonetheless, customers were assured that their money was safe.

67.     Despite the assurances, Defendants misappropriated some, if not all of customer funds sent to Icomtech.

68.     For example, when one customer accessed her account through the new on-line system in September 2019, the account did not reflect her investment.  In fact, all of the earnings previously reflected in her account had disappeared, and her account balance was listed as zero.

69.     Each of the Defendants aided and abetted each of the other Defendants' fraudulent acts and practices set forth in Paragraphs 60 to 68 above.

**G.     Defendants' Misrepresentations and Omissions Concerning Commissions and Bonuses.**

70.     Icomtech customers also were told they could earn commissions and "bonus points" by recruiting others to invest in Icomtech.  One Icomtech presentation stated:  (i) "YOU EARN 20% for each package you sell" and "YOU EARN 3% for each package that your direct affiliate sells"; and (ii) "bonus points" earned for recruiting others to invest could be used to obtain prizes, including iPhones, Rolex watches, trips (to Las Vegas, Hawaii or Dubai), luxury cars (e.g., a Mercedes Benz), or exchange for as much as $20,000 in cash.

71.     In furtherance of the Icomtech scheme, including through Icomtech solicitation materials posted on YouTube and in the Bitlionaires LA WhatsApp chat, Defendants and other Icomtech agents encouraged existing and prospective customers, including several California customers, to refer family and friends with promises of additional returns.  Some of the existing customers accepted deposits

from family and friends on behalf of Icomtech and then gave the money to another Icomtech agent.

72.     In actuality, one or more Icomtech customers did not receive referral commissions and/or bonuses as promised in various verbal and/or written Icomtech solicitations.

73.     However, on information and belief, some of the Defendants received commissions and/or bonuses for bringing new customers into the Icomtech scheme. For example, Brend claimed in a solicitation posted to the internet that he received a Mercedes Benz as an Icomtech bonus, but elected to exchange it for a $25,000 cash payment.

74.     The written promotional materials that Defendants and other Icomtech agents provided to customers and prospective customers did not disclose, and/or did not fully disclose, that customer money would be used to pay expenses for Icomtech and/or commissions and bonuses to Defendants and other Icomtech agents.

75.     Each of the Defendants aided and abetted each of the other Defendants' fraudulent acts and practices set forth in Paragraphs 70 to 74 above.

# V. VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISISON REGULATIONS

## COUNT ONE

### FRAUD BY DECEPTIVE DEVICE OR CONTRIVANCE

**Violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1),
and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2022)**

76. Paragraphs 1 through 75 of this Complaint are re-alleged and incorporated herein by reference.

77. 7 U.S.C. § 9(1), provides in relevant part:

It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any . . . contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate . . . .

78. 17 C.F.R. § 180.1(a), provides in relevant part:

It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

(1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or]

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

79. Digital assets such as Bitcoin are encompassed in the definition of "commodity" under Section 1a(9) of the Act, 7 U.S.C. § 1a(9).

80. During the Relevant Period, Defendants, individually and/or in concert with each other, intentionally or recklessly used or employed, or attempted to use and

employ, manipulative or deceptive devices or contrivances in connection with contracts of sale of any commodity in interstate commerce, in violation of 7 U.S.C. § 9(1), and 17 C.F.R. § 180.1(a)(1)-(3), including by:

    a.  Misappropriating customer funds by using customer funds:  (i) further promote the scheme; (ii) to pay for Icomtech expenses; and/or (iii) on information and belief, to pay themselves and other Icomtech agents commissions and bonuses, and/or

    b.  Misrepresenting in in-person meetings, Icomtech promotional events, in Icomtech promotional materials posted to the internet, and in electronic communications:

        i.  That Defendants and other Icomtech agents would use customer money to trade Bitcoin or other digital assets on the customers' behalves;

        ii.  That Icomtech customers could achieve specific daily earnings;

        iii.  That Icomtech customers' money would be doubled in approximately four to eight months; and

        iv.  That existing customers who referred a family member or friend to give money to Icomtech for Icomtech to trade Bitcoin or other digital assets on behalf of that family member or friend would, in turn, receive commissions and/or bonuses for the referrals; and/or

c.  Failing to disclose and/or failing to fully disclose in written solicitations and promotional materials that Defendants and other Icomtech agents provided to customers and prospective customers that customer money would be used to pay expenses for Icomtech and/or commissions and bonuses to Defendants and other Icomtech agents.

81.   Each act in furtherance of:  (1) using or employing, or attempting to use or employ, a manipulative device, scheme, or artifice to defraud; (2) making, or attempting to make, untrue or misleading statements of material fact, or omitting to state material facts necessary to make the statements not untrue or misleading; or (3) engaging, or attempting to engage, in any act, practice, or course of business, which operated or would operate as a fraud or deceit upon any person, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 6(c)(1) and Regulation 180.1(a)(1)-(3).

82.   During the Relevant Period, each of the Defendants willfully aided and abetted each of the other Defendants' fraudulent acts and practices described above and, therefore, are liable for that fraud pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a).

## VI.   <u>RELIEF REQUESTED</u>

WHEREFORE, the CFTC respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to the Court's inherent equitable powers:

A.    Find Defendants violated Sections 6(c)(1)  of the Act, 7 U.S.C. §§ 9(1) and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2022);

B.    Enter an order of permanent injunction restraining and enjoining Defendants and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons or entities in active concert with any one of them, who receive actual notice of such order by personal service or otherwise, from engaging in conduct described above in violation of 7 U.S.C. §§ 9(1) and 17 C.F.R. § 180.1(a)(1)-(3);

C.    Enter an order of permanent injunction restraining and enjoining Defendants, and any of their affiliates, agents, servants, employees, assigns, attorneys, and persons in active concert with any one of them, from directly or indirectly, in:

1.    Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

2.     Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2022)) or digital asset commodities, for accounts held in the name of

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION AND OTHER EQUITABLE RELIEF UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

Defendants or for any account in which they have a direct or indirect interest;

3.  Having any commodity interest or digital asset commodity traded on Defendants' behalf;

4.  Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests or digital asset commodities;

5.  Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests or digital asset commodities;

6.  Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022); and

7.  Acting as a "principal" (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2022)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the CFTC, except as provided for in 17 C.F.R. § 4.14(a)(9).

D.      Enter an order requiring Defendants, as well as any third-party transferee and/or successors, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, bonuses, loans, fees, revenues and trading profits derived, directly or indirectly, from acts or practices that constitute violations of the Act and Regulations as described herein, including pre-judgment and post-judgment interest;

E.      Enter an order directing Defendants and any of their, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the customer whose funds were received by them as a result of the acts and practices that constitute violations of the Act and Regulations, as described herein;

F.      Enter an order requiring Defendants and any of their successors, to make full restitution to every person or entity who has sustained losses proximately caused by the violations described herein, including pre-judgment interest;

G.      Enter an order directing Defendants to pay a civil monetary penalty assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. No. 114-74, tit. VII, § 701, 129 Stat. 584, 599-600, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2022), for each violation of the Act and Regulations, as described herein;

H.    Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

I.    Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Dated:  May 24, 2023                    Respectfully Submitted,

COMMODITY FUTURES TRADING
COMMISSION

Attorney for Plaintiff


By:  /s/James H. Holl, III
JAMES H. HOLL, III (CA Bar No. 177885)
jholl@cftc.gov
COMMODITY FUTURES TRADING
COMMISSION
1155 21st NW
Washington, DC  20581
(202) 418-5311 / (202) 418-5523 (fax)

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION AND OTHER
EQUITABLE RELIEF UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS