JAMES H. HOLL, III (CA Bar No. 177855)
jholl@cftc.gov
KATHLEEN M. BANAR, *pro hac vice*
kbanar@cftc.gov
JAMES W. DEACON, *pro hac vice*
jdeacon@cftc.gov
COMMODITY FUTURES TRADING COMMISSION
1155 21st Street, N.W.
Washington, D.C. 20581
(202) 418-5311 / (202) 418-5523 (fax)

ATTORNEYS FOR PLAINTIFF

**THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

**COMMODITY FUTURES TRADING COMMISSION,**

Plaintiff,

vs.

**DAVID CARMONA (a/k/a David Segundo Carmona a/k/a Wuilver Segundo), JUAN ARELLANO PARRA, MOSES VALDEZ, DAVID BREND, and MARCO A. RUIZ OCHOA, jointly d/b/a ICOMTECH,**

Defendants.

CASE NO. 2:23-cv-04015-MRA-RAO

**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR FINAL JUDGMENT BY DEFAULT FOR PERMANENT INJUNCTION, RESTITUTION, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF AGAINST DEFENDANTS DAVID CARMONA (a/k/a David Segundo Carmona a/k/a Wuilver Segundo), JUAN ARELLANO PARRA, MOSES VALDEZ AND DAVID BREND**

[*Filed Concurrently with Memorandum of Points and Authorities in Support, Declarations in Support, Proposed Order, and Certificate of Service*]

Assigned to Hon. Mónica Ramírez Almadani

Action Filed: 5/24/2023

HEARING DATE: 9/12/2024

| | |
|---|---|
| TIME: | 1:30 p.m. |
| PLACE: | First Street Courthouse<br>350 W. 1st Street<br>Courtroom 10B<br>10th Floor<br>Los Angeles, CA 90012 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Plaintiff Commodity Futures Trading Commission ("Plaintiff" or "CFTC" or "Commission') will, and hereby does, move the Court for entry of final judgment by default against Defendants David Carmona (a/k/a David Segundo Carmona a/k/a Wuilver Segundo) ("Carmona"), Juan Arellano Parra ("Arellano"), Moses Valdez ("Valdez") and David Brend ("Brend") (collectively, "Defaulting Defendants") pursuant to Fed. R. Civ. P. 55(b)(2) and Local Rules 55-1 and 55-2 (hereinafter, "Motion" or "Motion for Default Judgment").

In support of its Motion, as required by Fed. R. Civ. P. 55(b)(2) and Local Rules 55-1 and 55-2, the CFTC has contemporaneously filed:

1. The declaration of James W. Deacon, CFTC Senior Trial Attorney, dated August 13, 2024 (hereinafter cited as "Deacon Decl. ¶ __") and exhibits, which sets forth, among other things:

   a. When and against what parties the defaults were entered (*see*, Local Rule 55-1(a)): that is, that the Clerk of Court entered defaults against (i) Carmona on May 22, 2024; (ii) Arellano on July 20, 2023; (iii) Valdez on July 20, 2023; and (iv) Brend on July 20, 2023 (*see*, Deacon Decl. ¶¶ 3-28);

   b. The identification of the pleading to which default was entered (*see*, Local Rule 55-1(b)): that is, the CFTC's Complaint for Injunctive Relief, Civil Monetary Penalties, Restitution, and Other Equitable Relief Under the Commodity Exchange Act against Carmona,

Arellano, Valdez and Brend, as well as a non-defaulting defendant, for violations of Section 6(c)(1) of the Commodity Exchange Act, 7 U.S.C. § 9(1), and Commission Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2023), filed on May 24, 2023 (*see*, Deacon Decl. ¶ 2; ECF No. 1);

c. That the 7-day notice requirement of Fed. R. Civ. P. 55 (b)(2) does not apply here as none of the Defaulting Defendants have "appeared personally or by a representative" (*see*, Local Rule 55-1(e); Deacon Decl. ¶ 39); and

d. That a copy of Plaintiff's (1) Notice of Motion and Motion for Default Judgment Against Carmona, Arellano, Valdez and Brend; (2) Memorandum of Points and Authorities in support of the Motion; (3) Declarations of James W. Deacon and Kara L. Mucha in support of the Motion; and (4) Proposed Order, have been served upon each Defaulting Defendant as set forth in the Certificate Service. (*See*, Local Rule 55-2; Deacon Decl. ¶ 40.)

2. The declaration of Kara Mucha, CFTC Futures Investigator, dated August 6, 2024 (hereinafter cited as "Mucha Decl. at ¶ __") and exhibits, which sets forth, among other things:

a. That none of the Defaulting Defendants is an infant or incompetent person (*see*, Local Rule 55-1(c); Mucha Decl. ¶ 24);

b. That the Servicemembers Civil Relief Act (50 U.S.C. App. § 521) does not apply to any of the Defaulting Defendants (*see*, Local Rule 55-1(d); Mucha Decl. ¶ 23); and

c. Plaintiff's damage calculations for restitution purposes against the Defaulting Defendants, jointly and severally, in the amount of $1,098,920 (*see*, Fed. R. Civ. P. 55(b)(2) and Local Rule 55-2; Mucha Decl. ¶¶ 10-14, 19-21 and Exhibit 1).

Plaintiff has also filed contemporaneously with this Motion a Memorandum of Points and Authorities in support of the Motion, and a Proposed Order.

**PLEASE TAKE FUTHER NOTICE** that Plaintiff's Motion for Default Judgment will be heard on September 12, 2024 at 1:30 p.m., before the Honorable Mónica Ramírez Almadani, First Street Courthouse, 350 W. 1st Street, Courtroom 10B, 10th Floor, Los Angeles, California 90012.

CERTIFICATE OF COMPLIANCE WITH

LOCAL RULE 7-3

The CFTC has not met and conferred with Defaulting Defendants regarding this Motion for Default Judgment as the Clerk has entered their default and none of the Defaulting Defendants have made an appearance in this action, and to the CFTC's knowledge none have retained counsel in this action. *See* Local Rule 7-3.

Dated: August 13, 2024 Respectfully Submitted,

COMMODITY FUTURES TRADING COMMISSION

Attorneys for Plaintiff

By: /s/ *Kathleen Banar*

JAMES H. HOLL, III (CA Bar No. 177885)
jholl@cftc.gov
KATHLEEN M. BANAR, *pro hac vice*
kbanar@cftc.gov
JAMES W. DEACON, *pro hac vice*
jdeacon@cftc.gov

COMMODITY FUTURES TRADING COMMISSION
1155 21st NW
Washington, DC 20581
(202) 418-5311 / (202) 418-5523 (fax)

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR DEFAULT JUDGEMENT**

**TABLE OF CONTENTS**


I. PROCEDURAL BACKGROUND ..... 1

II. STATEMENT OF FACTS ..... 2

A. Summary of Defaulting Defendants' Scheme. ..... 2

B. Icomtech's Business, Websites, Promotional Events and Materials. ..... 4

C. Defaulting Defendants' Misrepresentations and Omissions Regarding Bitcoin and Other Digital Asset Commodity Trading. ..... 6

D. Defaulting Defendants and Their Codefendants Did Not Trade Bitcoin or Other Digital Asset Commodities as They Represented and Did Not Earn Daily Returns nor Double the Money. ..... 9

E. Some Icomtech Customers Lost the Full Amount of the Funds They Deposited with Defaulting Defendants for Trading. ..... 9

F. Defaulting Defendants' Misrepresentations and Omissions Concerning Commissions and Bonuses. ..... 10

G. Criminal Case. ..... 11

III. ARGUMENT ..... 12

A. Jurisdiction and Venue. ..... 12

B. Default Judgment Is Warranted Against Defaulting Defendants. ..... 13

1. The Commission Would Suffer Prejudice (*Eitel* Factor One). ..... 13

2. The Commission's Complaint States a Claim as to Each Defaulting Defendant (*Eital* Factors Two and Three). ..... 14

3. Sums of Money at Stake (*Eitel* Factor Four). ..... 22

4. There is Minimal Possibility of Dispute Concerning Material Facts (*Eitel* Factor Five). ..... 23

5. There is No Evidence of Excusable Neglect (*Eitel* Factor Six). ..... 24

6. Policy Favoring Judgment on Merits Does Not Warrant Denying Default Judgment (*Eitel* Factor Seven). ........ 24

C. Remedies and Damages. ........ 24

1. Permanent Injunction. ........ 24

2. Restitution, Civil Monetary Penalty, and Post-Judgment Interest. ........ 26

IV. CONCLUSION ........ 30

# TABLE OF AUTHORITIES

**CASES**

*Aldabe v. Aldabe*, 616 F.2d 1089 (9th Cir. 1980) ........ 12

*Brown v. China Integrated Energy, Inc.*, 875 F.Supp.2d 1096 (C.D. Cal. 2012) ........ 21

*CFTC v. Am. Bullion Exch. ABEX Corp.*, No. SACV 10-01876 DOC (RNBx), 2014 WL 3896023 (C.D. Cal. Aug. 7, 2014) ........ 28

*CFTC v. Am. Bullion Exch. ABEX Corp.*, No. SACV10–1876 DOC (RNBx), 2014 WL 12603558 (C.D. Cal. Sept. 16, 2014) ........ 23

*CFTC v. Arrington*, No. 8:11CV181, 2014 WL 685331 (D. Neb. Jan. 28, 2014) ........ 28

*CFTC v. Capitol Equity FX LLC*, No. EDCV 17-743 JGB (SKx), 2017 WL 9565340 (C.D. Cal. July 31, 2017) ........ 17, 18

*CFTC v. Crombie*, No. 4:11-cv-04577-CW, 2019 WL 3403591 (N.D. Cal. June 5, 2019), *aff'd*, *CFTC v. Crombie*, 859 Fed. App'x 840 (9th Cir. Sept. 21, 2021) ........ 26

*CFTC v. Driver*, 877 F.Supp.2d 968 (C.D. Cal. 2012) ........ passim

*CFTC v. Emerald Worldwide Holdings, Inc.*, No. CV03-8339AHM, 2005 WL 1130588 (C.D. Cal. Apr. 19, 2005) ........ 27

*CFTC v. Fin. Tree*, No. 2:20-cv-01184-TLN-AC, 2022 WL 36416 (E.D. Cal. Jan. 4, 2022), *report and recommendation adopted by*, 2022 WL 718391 (E.D. Cal. Mar. 9, 2022) ........ 14

*CFTC v. Fin. Tree*, No. 2:20-cv-01184-TLN-AC, 2022 WL 718391 (E.D. Cal. Mar. 9, 2022) ........ 14

*CFTC v. Harrison*, 255 F. Supp. 3d 645 (D.S.C. 2015) ........ 26

*CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317 (S.D. Fla. 2014) ........ 16, 20, 22

*CFTC v. Leighton,* No. 2:12–cv–04012-PSG-SS, 2013 WL 4101874 (C.D. Cal. July 8, 2013) ........ 27

*CFTC v. Main and Prospect Capital, LLC*, No. 2:19-cv-09736-FLA (AFMx),

2022 WL 17666395 (C.D. Cal. August 22, 2022)........................................14, 24
*CFTC v. McDonnell*, 287 F. Supp. 3d 213 (E.D.N.Y 2018)...............................15, 17
*CFTC v. McDonnell,* 332 F. Supp. 3d 641 *(*E.D. N.Y. 2018*)*.................16, 18, 19, 20
*CFTC v. Monex Credit Co*., 931 F.3d 966 (9th Cir. 2019) .......................................16
*CFTC v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d 492 (D. Mass. 2018)...................16
*CFTC v. RJ Fitzgerald & Co.*, 310 F.3d 1321 (11th Cir.2002) ....................16, 20, 26
*CFTC v. Safevest, LLC*, No. SACV08–00474 JVS (MLGx), 2009 WL 2448116 (C.D. Cal. July 13, 2006)..........................................................................23
*CFTC v. Safevest, LLC*, No. SACV08-00474-JVS (MLGx), 2008 WL 5103202 (C.D. Cal. Dec. 1, 2008)............................................................................22
*CFTC v. The Trade Tech Institute, Inc.*, No. CV 11–2163–GHK (PLAx), 2012 WL 13008332 (C.D. Cal. Jun. 19, 2021)....................................................23
*CFTC v. Trimble*, No. 11–cv–02887-PAB-KMT, 2013 WL 317576 (D. Colo. Jan. 28, 2013)...........................................................................................28
*Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261 (9th Cir. 1992) .............................13
*Danning v. Lavine,* 572 F.2d 1386 (9th Cir. 1978) ............................................13, 14
*Discovery Commc'n, Inc. v. Animal Planet, Inc.*, 172 F. Supp. 2d 1282 (C.D. Cal. 2001)...............................................................................................14
*Eitel v. McCool*, 782 F.2d 1470 (9th Cir. 1986).................................................13, 14
*F.T.C. v. EDebitPay, LLC*, 695 F.3d 938 (9th Cir. 2012) .........................................25
*Garden City Boxing Club, Inc. v. Aranda*, 384 Fed. App'x 688 (9th Cir. 2010) ..........................................................................................................27
*Gebhart v. SEC*, 595 F.3d 1035 (9th Cir. 2010).......................................................16
*Geddes v. United Fin. Group*, 559 F.2d 557 (9th Cir. 1977) ..............................13, 14
*Halsey v. Colonial Asset Mgmt.*, No. 5:13-cv-02025 JGB (DTBx), 2014 WL 12601015 (C.D. Cal. July 17, 2014) ..................................................24
*Hirk v. Agri-Research Council, Inc.*, 561 F.2d 96 (7th Cir. 1977).............................19
*In re Miller*, CFTC No. 92-4, 1995 WL 368601 (June 16, 1995).......................25, 26

*In re Staryk*, CFTC No. 95-5, 2004 WL 1657544 (July 23, 2004) ....................25, 26
*In re Tuli*, 172 F.3d 70 (9th Cir. 1999) ....................12
*Miller v. CFTC*, 197 F.3d 1227 (9th Cir. 1999) ....................26, 28
*Monieson v. CFTC*, 996 F.2d 852 (7th Cir. 1992) ....................25
*New Mexico State Investment Council v. Ernst & Young LLP*, 641 F.3d 1089 (9th Cir.2010)....................21
*Ox Labs, Inc. v. Bitpay, Inc.*, No. CV 18-5934-MWF (KSx), 2020 WL 1039012 (C.D. Cal. Jan. 24, 2020) ....................16
*PepsiCo, Inc. v. California Sec. Cans*, 238 F. Supp. 2d 1172 (C.D. Cal. 2002)....................22, 24
*PepsiCo, Inc. v. Triunfo-Mex, Inc.*, 189 F.R.D. 431 (C.D. Cal. 1999)....................13
*R & W Tech. Servs. Ltd. v. CFTC*, 205 F.3d 165 (5th Cir. 2000) ....................19
*Reddy v. CFTC*, 191 F.3d 109 (2d Cir. 1999) ....................25
*SEC v. Alliance Leasing Corp.*, No. 98-cv-1810 J (CGA), 2000 WL 35612001(S.D. Cal. Mar. 20, 2000) ....................17
*SEC v. Lee*, 720 F. Supp. 2d 305 (S.D.N.Y. 2010) ....................19
*SEC v. Lottonet Operating, Corp.* No. 17-21033-CIV-LENARD/GOODMAN, 2017 WL 6989148, at *1 (S.D. Fla. Apr. 6, 2017)....................18
*SEC v. Lottonet Operating, Corp.,* No. 17-21033-CIV-LENARD/GOODMAN, 2017 WL 6949289 (S.D. Fla. Mar. 31, 2017) ....................18
*SEC v. Pedras*, No. CV 13–7932 GAF (MRWx), 2014 WL 12597332 (C.D. Cal. Apr. 16, 2014) ....................27
*SEC v. Wyly*, 788 F. Supp. 2d 92 (S.D.N.Y. 2011) ....................20
*SEC v. Zandford*, 535 U.S. 813 (2002)....................19
*Sky Billards, Inc. v. Loong Star, Inc.*, No. EDCV 14-921 JGB (SPx), 2016 WL 6661175 (C.D. Cal. Mar. 17, 2016) ....................14, 24
*Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6 (1971)....................19

*Tatum v. Legg Mason Wood Walker, Inc.*, 83 F.3d 121 (5th Cir. 1996) .................... 19
*TeleVideo Sys. Inc. v. Heidenthal*, 826 F.2d 915 (9th Cir. 1987) .............................. 13
*United States v. Carmona,* 1:22-cr-00551-JLR (S.D.N.Y) ...................................... 11
*United States v. Miller*, 588 F.2d 1256 (9th Cir. 1978) ............................................ 25

**STATUTES**

28 U.S.C. § 1331 ............................................................................................ 12
28 U.S.C. § 1345 ............................................................................................ 12
28 U.S.C. § 1961(a) ........................................................................................ 29
7 U.S.C. § 13(b) ............................................................................................. 26
7 U.S.C. § 13a-1 ............................................................................................. 24
7 U.S.C. § 13a-1(a) ......................................................................................... 12
7 U.S.C. § 13a-1(d)(1) ..................................................................................... 28
7 U.S.C. § 13a-1(d)(3)(A) ................................................................................ 27
7 U.S.C. § 13a-1(e) ......................................................................................... 13
7 U.S.C. § 13c(a) ............................................................................................ 15
7 U.S.C. § 1a(9) .............................................................................................. 15
7 U.S.C. § 3(b) ........................................................................................ 14, 22
7 U.S.C. § 6b(a) .............................................................................................. 20
7 U.S.C. § 6b(a)(2)(A) and (C) ........................................................................ 18
7 U.S.C. § 9(1) ........................................................................................ passim
7 U.S.C. § 9(a) ........................................................................................ 14, 15
7 U.S.C. §13c(a) ............................................................................................. 22
15 U.S.C.A. 78j(b) .................................................................................. 18, 20

**RULES**

Fed. R. Civ. P. 55(b) ................................................................................. 1, 13
Fed. R. Civ. P. 8(b)(6) .............................................................................. 14, 24

**REGULATIONS**

17 C.F.R. § 143.8(a)(b)(1) .......... 28
17 C.F.R. § 143.8(b)(1) .......... 28
17 C.F.R. § 180.1 .......... 19
17 C.F.R. § 180.1(a) .......... passim
17 C.F.R. § 180.1(a)(1)-(3) .......... 1, 14, 16

## INTRODUCTION

The Plaintiff Commodity Futures Trading Commission ("Plaintiff" or "CFTC" or "Commission") submits this Memorandum of Points and Authorities in support of its motion, pursuant to Fed. R. Civ. P. 55(b) and Local Rules 55-1 and 55-2, for the Court's entry of final judgment by default against defendants David Carmona (a/k/a/ David Segundo Carmona a/k/a Wuilver Segundo) ("Carmona"), Juan Arellano Parra ("Arellano"), Moses Valdez ("Valdez"), and David Brend ("Brend") (collectively, "Defaulting Defendants") (hereinafter, "Motion" or "Motion for Default Judgment").[1] The CFTC respectfully request that the Court grant the Motion for the reasons set forth below.

## I. PROCEDURAL BACKGROUND

On May 24, 2023, the CFTC filed a Complaint for Injunctive Relief, Civil Monetary Penalties, Restitution, and Other Equitable Relief Under the Commodity Exchange Act and Commission Regulations (ECF No. 1 ("Compl.") against Carmona, Arellano, Valdez, Brend and another defendant[2] for violations of Section 6(c)(1) of the Commodity Exchange Act ("Act" of "CEA"), 7 U.S.C. § 9(1), and Commission Regulation ("Regulation") 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2023). In general, the Complaint alleged that Defaulting Defendants, individually and jointly doing business as "Icomtech", and each aiding and abetting each other,

---

[1] In support of its Motion and in accordance with Local Rules 55-1 and 55-2, and Fed. R. Civ. P. 55(b), the CFTC has filed (1) the declaration of James W. Deacon, CFTC Senior Trial Attorney, dated August 13, 2024 (hereinafter, "Deacon Decl. ¶ __"), and exhibits, pursuant to Local Rule 55-1; and (2) the declaration of Kara L. Mucha, CFTC Futures Investigator, dated August 6, 2024 (hereinafter, "Mucha Decl. ¶ __"), and exhibits, pursuant to Local Rules 55-1 and 55-2.

[2] The other defendant named in the Complaint, Marco A. Ruiz Ochoa ("Ruiz Ochoa"), filed an answer to the Complaint on June 10, 2024 (ECF No. 71) and continues to defend this action. Thus, this Motion for Default Judgment does not apply to him.

engaged in a multi-level marketing scheme involving the fraudulent solicitation and misappropriation of customer funds through false representations from at least August 2018 through at least December 2019 ("Relevant Period"). (ECF No. 1, Compl. ¶¶ 1-8.)

On May 26, 2023, the Clerk of Court ("Clerk") issued Summonses for the Defaulting Defendants. (*See*, ECF No. 11 as to Carmona, EDF No. 12 as to Arellano, ECF No. 14 as to Valdez, and ECF No. 13 as to Brend; *see also*, Deacon Decl. ¶ 3.) Each of the Defaulting Defendants was personally served with the Summons and Complaint but failed to answer or otherwise respond to the Complaint. (*See* Deacon Decl. ¶¶ 4-28.) Accordingly, the Clerk entered default as to each of them pursuant to Fed. R. Civ. P. 55(a). (*Id*. ¶¶ 7, 12, 17, 27.)

## II. STATEMENT OF FACTS

Unless otherwise specified, the following allegations are asserted in the Commission's Complaint and incorporated herein by reference. (ECF No. 1, Compl., ¶¶ 1-75.)

### A. Summary of Defaulting Defendants' Scheme.

Defaulting Defendants, individually and jointly doing business as "Icomtech", and each aiding and abetting each other, defrauded 190 individuals ("customers"), many in Spanish-speaking communities, out of more than a million dollars. (ECF No. 1, Compl. ¶¶ 1-8, 36, 59, 69, 75, 80-82; *see also*, Mucha Decl. ¶¶ 10-14, 9-21 and Exhibit ("Ex.") 1 thereto.) Defaulting Defendants' fraud was in connection with their purported digital asset commodity trading on the customers' behalves during the period Relevant Period. (ECF No. 1, Compl., ¶¶ 1-4, 21, 24-26, 34-35, 80.)

To induce customers to give them money, Defaulting Defendants and other Icomtech agents represented to current and prospective customers (a) that they would use customer money to trade Bitcoin and other digital asset commodities on the customers' behalves (*Id*. ¶¶ 2, 26, 34, 35); (b) that Icomtech would provide

"daily returns" on the customers' money from the trading of between 0.9% to 2.8% (*id*. ¶¶ 2, 35, 50, 54); (c) that Icomtech would double the customers' money in approximately four to eight months from the trading (*id*. ¶¶ 2, 35, 45-46, 49, 54); (d) that Icomtech would create an online account for the customer where the customers purportedly could watch their money grow (*id*. ¶¶ 2, 29--33, 35); and (e) that existing customers who referred family and friends to Icomtech would, in turn, receive commissions and/or bonuses for those referrals. (*Id*. ¶¶ 4, 50, 54, 70-71.) These representations were made via in-person meetings including in customers' homes, at Icomtech promotional events, in Icomtech PowerPoint and other presentations and documents circulated at Icomtech promotional events, via YouTube and other presentations posted to the internet, in Zoom meetings, and through word-of mouth. (ECF No. 1, Compl. ¶¶ 34-54.)

However, in actuality, Defaulting Defendants did not trade Bitcoin or other digital asset commodities on the customers' behalves as they represented, and did not earn daily returns nor double the customers' investments based on trading. (*Id*. ¶¶ 3, 57, 59, 80.b.) Instead, Defaulting Defendants used customer funds to further promote the scheme, to pay for personal expenses, and to pay themselves commissions and bonuses. (*Id*. ¶¶ 3, 58-59, 67, 73, 80.a.) Indeed, numerous Icomtech customers lost all of their funds. (*Id*. ¶¶ 3, 6, 60-69.)

Moreover, despite referring family and friends to Icomtech, one or more Icomtech customers did not receive commissions and/or bonuses for those referrals as Defaulting Defendants had promised. (*Id*. ¶ 4, 70-75.) Finally, Defaulting Defendants failed to disclose or fully disclose in Icomtech's written solicitation materials provided to customers and prospective customers that customer money would be used to pay expenses for Icomtech and/or commissions and bonuses to Defaulting Defendants and other Icomtech agents. (*Id*. ¶¶ 5, 74-75, 80.c.)

**B. Icomtech's Business, Websites, Promotional Events and Materials.**

Throughout the Relevant Period, Defaulting Defendants did business, operated and marketed Bitcoin and other digital asset commodity trading to U.S. persons under the name "Icomtech." (ECF No. 1, Compl. ¶ 21.)[3] Icomtech was created by Carmona and other Icomtech "founders." (*Id.* ¶ 19.) Carmona, Arellano and Valdez among others were Icomtech's "Main Leaders", and the website the www.icomtech.org identified Valdez and Brend, along with their picture, as part of the Icomtech "TEAM". (*Id.* ¶ 23.)[4]

Icomtech promotional material posted to the internet in 2019 (i) claimed that Icomtech was a company "with the mission to create the largest exchange in the world" for the purposes of buying and selling cryptocurrency, including Bitcoin; (ii) that its goal was to become like other major cryptocurrency exchanges, including Coinbase, Binance and Bitmex; and (iii) touted Carmona as someone who had made a fortune trading cryptocurrency, including Bitcoin. (*Id.* ¶ 24.) Other Icomtech promotional materials posted to the internet pitched Icomtech as "a technological institution based on Bitcoin," and/or encouraged customers to "be part of this revolution of transactions in Bitcoin" through, at least in part, trading Bitcoin through Icomtech. (*Id.* ¶ 25.)

Icomtech had two websites, "icomtech.io" and "icomtech.org," during the Relevant Period. (*Id.* ¶ 28.) Once the customer paid cash or transferred money by other means to the Icomtech agent whom had solicited them, an Icomtech agent created an online account for the customer through the Icomtech websites. (*Id.* ¶ 29.) Thereafter, the customers could access their account information, and check the

---

[3] Icomtech was not during the Relevant Period registered as a business entity in the United States. (ECF No. 1, Compl. ¶ 20.)

[4] None of the Defaulting Defendants have ever been registered with the Commission. (ECF No. 1, Compl. ¶¶ 14-17.)

value of their accounts, by logging in through the Icomtech websites. (*Id.* ¶ 30.) For example, the "Dashboard" page of the "icomtech.io" website showed the customer his or her purported "Total Earning[s]" and provided a link to individual account(s) statements. (*Id.* ¶ 31.) Customers routinely accessed and used the account statements to track their earnings from Defaulting Defendants' supposed trading on their behalves. (*Id.*)

The "icomtech.org" website also allowed customers to perform multiple account-related functions through either the website or a Smartphone app, including registering new members, reviewing their earnings, and withdrawing their funds. (*Id.* ¶ 32.) Regarding withdrawals, customers generally were told that they could withdraw their funds through the website or a Smartphone app beginning six months after deposit or after a minimum amount of $150 in earnings had accumulated. (*Id.* ¶ 33.)

With respect to Icomtech promotional events, Icomtech flyers and/or advertisements listed the dates and locations for Icomtech promotional events. (*See*, e.g., ECF No. 1, Compl. ¶¶ 37, 39.) The events were held in, in among other places, California, including within the Central District of California. (*Id.*) In some instances, hundreds of people attended these Icomtech events. (*Id.* ¶ 38.) At each of these promotional events, one or more of Defaulting Defendants made fraudulent misrepresentations to customers and prospective customers as described in Part II.A above and Part II.C below. (*Id.* ¶¶ 26, 34-36, 39-40, 50-51.)[5]

---

[5] Valdez, Arellano and other Icomtech agents organized the conference rooms or other hotel services, among other things, for the Icomtech promotional events. (*See*, e.g., ECF No. 1, Compl. ¶ 41 (Valdez ordered and paid a deposit for a conference room and other services for a May 2019 Icomtech event in Montebello, California; (iii) Arellano acted as Icomtech's contact person in connection with an August 24, 2019 Icomtech event at the Quiet Cannon Montebello conference center; and (iv) Arellano paid a deposit for a conference room at the Quite Cannon Montebello conference center in connection with a September 28, 2019 Icomtech event.)).

With respect to promotional material, Carmona and the non-defaulting Defendant drafted or assisted in drafting Icomtech promotional materials that were posted on the Internet and/or circulated at Icomtech promotional events. (ECF. No. 1, Compl. ¶¶ 34, 42.) Those materials contained fraudulent misrepresentations. (*Id.* ¶ 42; *see also* Part II.C below). Further, Valdez hosted a WhatsApp group chat titled "Bitlionaires LA." (*Id.* ¶ 43.) The group chats contained links to Icomtech advertisements, meeting notices, presentations and videos. (*Id.*) Some of those advertisements, presentations and videos contained fraudulent misrepresentations. (*Id.* ¶¶ 43-46; *see also* Part II.C below). In addition, Brend used text messages, chats, and a YouTube video to solicit customers, some of which contained fraudulent misrepresentations. (*Id.* ¶¶ 47-49, 54; *see also* Part II.C below).

Defaulting Defendants doing business as Icomtech communicated amongst themselves and other Icomtech agents via instant messaging and other messenger applications, like WhatsApp, about rates of return, solicitation materials, and how to handle customer money. (*Id.* ¶ 55.) And they coordinated their solicitation activities: they often attended and presented at the same Icomtech solicitation events, used the same or similar fraudulent solicitation pitches and materials at those events and in customer meetings, and used the same or similar fraudulent solicitation materials. (*Id.* ¶¶ 55-56.)

### C. Defaulting Defendants' Misrepresentations and Omissions Regarding Bitcoin and Other Digital Asset Commodity Trading.

A flyer posted a Bitlionaires LA WhatsApp chat (Valdez was the administrator for the chatroom) advertising an Icomtech sponsored event to be held on April 2, 2019 at the Double Tree Hotel in Commerce, California, stated: "Icomtech offers you the opportunity to have your own cryptocurrency business. You can generate thousands of dollars in digital gold, called Bitcoin, through e-commerce, trading, and mining, and thus grow your financial freedom." (*Id.* ¶ 44.)

At least one Icomtech presentation posted to the Bitlionaires LA WhatsApp

group chat on June 15, 2019 also included the claim "Double by Trading" and that the money could be doubled in 140 days approximate. (*Id.* ¶ 45.) Another Icomtech advertisement posted to the Bitlionaires LA WhatsApp group chat also included the phrase "Double by Trading" and lists "140 DAYS APPROXIMATE" next to the word "DOUBLE." (*Id.* ¶ 46.) Brend claimed in a YouTube video presentation entitled "Icomtech English Presentation 2019" that Icomtech used trading "algorithms," that the algorithms allowed Icomtech to "consistently" generate gains trading Bitcoin and thus "create a standard revenue for us," and that customers' money would "double in roughly between six and eight months." (*Id.* ¶¶ 48-49.)

Carmona and the non-defaulting Defendant also claimed that Icomtech used "sophisticated algorithms" to do the trading. (*Id.* ¶ 50.) For example, during an Icomtech promotional event held in or about January 2019 at "Luminarias" restaurant in Monterey Park, California, they claimed that: (a) they were in the business of trading cryptocurrency, and had "robots doing the trading with sophisticated algorithms...."; (b) a person's initial investment would be doubled within a six-month period; (c) the customer would be paid a percentage between .9% to 3% of the original investment on a daily basis; (d) the customer's money could be withdrawn in Bitcoin through a bitcoin wallet on a weekly basis once a minimum amount of $150 in earnings was accumulated; and (e) through the multi-level marketing referral program, a customer would receive a 20% commission on the investment of anyone referred. (*Id.*)

Arellano and other Icomtech agents solicited one California customer in the summer of 2019. (*Id.* ¶ 51.) The customer was told during the solicitation, among other things, that it was easy to make money through Icomtech via daily trading and that the customer's money could be doubled in 120 days. (*Id.*) From the solicitation, the customer understood that Arellano would trade mostly in Bitcoin and other digital asset commodities and generate big profits. (*Id.*)

Icomtech promotional presentations and materials also explained that

Icomtech offered as many as eight (8) “Packages” that customers could choose to purchase for set amounts ranging from an upfront payment of $300 up to $20,000. (*Id.* ¶ 52.) Customers purchased packages predominately through cash payments to one or more Defaulting Defendants or other Icomtech agents. (*Id.*) The www.icomtech.org website also contained a chart entitled “Packages” with a listing, by a Package number, of graduated “points” and a “global pool bonus” for higher dollar investment amounts and various percentage ranges associated with profitability. (*Id.* ¶ 53.)

Brend gave an example of how one “package” worked in his YouTube video presentation entitled “Icomtech English Presentation 2019,” and how a customer could make even more money by referring friends and family, stating (in pertinent part, that customers could, for example, “invest” in “a $300 package, and ***that will double in roughly between six and eight months***. It depends on the package and what algorithm that you're locked into[.]” (*Id.* ¶ 54 (emphasis in Complaint).) Brend continued:

> “So once [you put in money], ***as soon as you do that you make 20 percent from your own money, because that is your first level***. And then if you decide to ***sign up your aunt or your mom or family member***, and you do that, that person that you sign up below that second package would be your second level ***and that would give you 3 percent, so you get a two-tier system but total you can make on your own money up to 23% or by bringing people in*** . . . .

(*Id.* (emphasis in Complaint).) Brend made clear that:

> “[A]ll of this is based on trading mainly. We do have some mining values that are coming in here, but most of this is involved in the trading and ***you make about 0.9 to 2.8 percent every single day***, Monday through Friday, and then also on Fridays, you can see that ***you'll actually get an opportunity to withdraw every Friday*** from between

3:00 to 9:00 p.m. Pacific Standard Time."

(*Id.* (emphasis in Complaint).)

**D. Defaulting Defendants and Their Codefendant Did Not Trade Bitcoin or Other Digital Asset Commodities as They Represented and Did Not Earn Daily Returns nor Double the Money.**

Notwithstanding the representations set forth above, in actuality, Defendants, including Defaulting Defendants, (i) did not trade Bitcoin or other digital asset commodities on the customers' behalves as represented; (ii) did not earn daily returns of between .09% and 2.8% based upon the trading; and (iii) did not double the customers' money based on trading. (ECF No. 1, Compl. ¶¶ 3, 57, 59.) Instead, Defaulting Defendants used customer funds to further promote the scheme, to pay for personal expenditures, and to pay themselves and other Icomtech agents commissions and bonuses. (*Id.* ¶¶ 3, 58, 67, 69.)

**E. Some Icomtech Customers Lost the Full Amount of the Funds They Deposited with Defaulting Defendants for Trading.**

Customers submitted their payments for an Icomtech package to an Icomtech agent via cash, wire transfer, check, money transfer services, and/or a digital asset commodity, specifically, Bitcoin. (ECF No. 1, Compl. ¶ 60.) Some customers were told that they could only pay in cash. (*Id.*) Some of the cash payments by customers were deposited in bank accounts owned by Defaulting Defendants, or in bank accounts in the name of companies associated with one or more of the Defaulting Defendants, including True Credit Repair LLC, a company owned by the Brend's wife. (*Id.* ¶ 61.)

During the Relevant Period, Carmona, Valdez, Arellano, and Brend received customer funds, either directly from customers, from companies associated with certain Defaulting Defendants,[6] or from other Defaulting Defendants or from

[6] A number of Icomtech customers and an Icomtech agent on behalf of Icomtech

Icomtech agents. (*Id*. ¶¶ 61-63.) Some of the customer funds given to Carmona were deposited into a bank account in his name. (*Id*. ¶ 63.a.)

Customers were generally told that, after six months or after a minimum amount of $150 in earnings accumulated, they could withdraw funds from their accounts on Fridays. (*Id*. ¶ 64.) Beginning in the late summer of 2019, some Icomtech customers attempted to withdraw their account balances in U.S. dollars and/or digital asset commodities in accordance with the instructions but found they were unable to do so, with limited exceptions. (*Id*.) A number of customers confronted Carmona and Valdez about their inability to withdraw their funds, and demanded the return of their money. (*Id*. ¶ 65.) Carmona and Valdez provided purported explanations as to why the money could not be immediately withdrawn; customers were assured that their money was safe. (*Id*. ¶ 66.)

Despite the assurances, Defaulting Defendants misappropriated some, if not all of customer funds sent to Icomtech. (*Id*. ¶¶ 67-69.) Indeed, at least 190 customers incurred net losses totaling $1,098,920. (Mucha Decl. ¶¶ 10-14, 19-21 and Ex. 1 thereto.)

**F. Defaulting Defendants' Misrepresentations and Omissions Concerning Commissions and Bonuses.**

Icomtech customers also were told they could earn commissions and "bonus points" by recruiting others to invest in Icomtech. (ECF No. 1, Compl. ¶ 70.) One Icomtech presentation stated that customers could earn 20% for each package they sold, 3% for each package they directed their affiliate to sell. (*Id*.) They were further told that "bonus points" for recruiting others to invest could be used to obtain prizes, including iPhones, Rolex watches, trips (to Las Vegas, Hawaii or Dubai),

---

customers, gave money to Brend by making payment to him through PayPal and/or by writing checks to his wife's company, True Credit Repair LLC. (ECF No. 1, Compl. ¶ 63.) Brend was a signatory on the True Credit Repair LLC's bank account into which some Icomtech customer money was deposited. (*Id*.)

luxury cars (e.g., a Mercedes Benz), or exchange for as much as $20,000 in cash. (*Id.*)

Defaulting Defendants' and other Icomtech agents encouraged existing and prospective customers, including several California customers, to refer family and friends with promises of additional returns. (*Id.* ¶ 71.) Despite some customers accepting deposits from family and friends and giving that money to an Icomtech agent, one or more Icomtech customers did not receive referral commissions and/or bonuses as Defaulting Defendants promised in various verbal and written Icomtech solicitations. (*Id.* ¶¶ 71-72, 75.)

The written promotional materials that Defaulting Defendants and other Icomtech agents provided to customers and prospective customers did not disclose, and/or did not fully disclose, that customer money would be used to pay expenses for Icomtech and/or commissions and bonuses to Defaulting Defendants and other Icomtech agents. (*Id.* ¶¶ 74-75.) However, some of the Defaulting Defendants received commissions and/or bonuses. (*Id.* ¶ 73.) Indeed, Brend claimed in a solicitation posted to the internet that he received a Mercedes Benz as an Icomtech bonus, but elected to exchange it for a $25,000 cash payment. (*Id.*)

**G. Criminal Case.**

On October 13, 2022, the U.S. Attorney's Office for the Southern District of New York ("Government") unsealed criminal wire fraud charges against Defaulting Defendants and two others in connection with the Icomtech scheme. (*See* ECF No. 1, Compl. ¶ 27 (citing to October 13, 2022 Indictment, *United States v. Carmona,* 1:22-cr-00551-JLR (S.D.N.Y), Criminal ("Crim.") ECF No. 2 [hereinafter, "Criminal Case" or "*U.S. v. Carmona*"].) The Criminal Case was filed against Carmona, Arellano, Valdez, Brend, and two others in connection with the Icomtech scheme. (*See* Deacon Decl. ¶ 19 & Ex. 1.)

The Indictment in the Criminal Case included much the same allegations concerning Defaulting Defendants' and others' misconduct as alleged in the

Complaint, as well as multiple aspects of a larger fraudulent scheme. (Deacon Decl. ¶ 29 & Ex. 1.) Carmona pleaded guilty to the wire fraud charges in Count 1 of the Indictment on December 22, 2023, and is awaiting sentencing. (*Id.* ¶ 30 & Ex. 2.) Arellano pleaded guilty to two counts contained in a superseding information (Count 1 as to wire fraud and Count 2 as to conspiracy to commit money laundering) on February 29, 2024, and is awaiting sentencing. (*Id.* ¶ 32 & Ex. 2.) Brend was convicted of the wire fraud charges in Count 1 of the Indictment on March 14, 2024 following trial, and is awaiting sentencing. (*Id.* ¶ 36 and Ex. 2.) As to Valdez, based upon the criminal docket sheet in that case, it appears that the wire fraud charges against him are still pending. (*Id.* ¶ 34.)

## III. ARGUMENT

### A. Jurisdiction and Venue.

The question of default judgment is left to the Court's sound discretion once the Court determines it has jurisdiction over the action and the parties. *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999); *Aldabe v. Aldabe*, 616 F.2d 1089, 1092-93 (9th Cir. 1980). This Court possesses jurisdiction over this action pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), which authorizes the Commission to seek injunctive and other relief in a United States District Court against any person whenever it appears to the Commission that such person has violated the Act or Regulations. (ECF No. 1, Compl. ¶ 11.) The Court also has jurisdiction under 28 U.S.C. § 1331 (federal question) and § 1345 (civil actions commenced by the United States or agencies thereof). (*Id.*)

The Court possesses personal jurisdiction over Defaulting Defendants because certain transactions, acts, practices and courses of business alleged in the Complaint occurred within this District, among other places. (ECF No. 1, Compl. ¶ 12; *see also*, *e.g.*, *id.* ¶¶ 23, 34-35, 37-41, 43-54, 56, 59, 75, 80, 82.) Venue is proper for the same reasons, pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e). (ECF No. 1, Compl. ¶ 12).

**B. Default Judgment Is Warranted Against Defaulting Defendants.**

Following an entry of default pursuant to Fed. R. Civ. P. 55(a), Fed. R. Civ. the Court is permitted to enter default judgment against a party pursuant to Fed. R. Civ. P. 55(b). "The general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *TeleVideo Sys. Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987) (citation and quotation marks omitted); *see also*, *Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977) (same). However, while well-pleaded allegations in the Complaint are deemed admitted by a defendant's failure to respond, "facts not contained in the pleadings, and claims which are legally insufficient, are not established by default." *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992) (citing *Danning v. Lavine,* 572 F.2d 1386, 1388 (9th Cir. 1978)).

The Ninth Circuit has articulated the following "[f]actors which may be considered by courts in exercising discretion as to the entry of default judgment": "(1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action[,] (5) the possibility of a dispute concerning material facts[,] (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits." *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986) ("*Eitel* factors"). "In applying this discretionary standard, default judgments are more often granted than denied." *PepsiCo, Inc. v. Triunfo-Mex, Inc.*, 189 F.R.D. 431, 432 (C.D. Cal. 1999).

Each of the *Eitel* factors weighs in favor of granting the Commission's Motion for Default Judgment.

**1. The Commission Would Suffer Prejudice (*Eitel* Factor One).**

The Commission will suffer prejudice if default judgment is not entered because it "will be deprived of the opportunity to obtain judicial resolution of its

claim[s]." *Sky Billards, Inc. v. Loong Star, Inc.*, No. EDCV 14-921 JGB (SPx), 2016 WL 6661175, at *5 (C.D. Cal. Mar. 17, 2016). Indeed, one of the primary purposes of the CEA is "to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets[.]" 7 U.S.C. § 3(b). Accordingly, "[a]bsent entry of default judgment, the CFTC would be prejudiced by its inability to enforce federal commodities laws efficiently and effectively." *CFTC v. Main and Prospect Capital, LLC*, No. 2:19-cv-09736-FLA (AFMx), 2022 WL 17666395, at *4 (C.D. Cal. August 22, 2022) (citing *CFTC v. Fin. Tree*, No. 2:20-cv-01184-TLN-AC, 2022 WL 36416, at *12 (E.D. Cal. Jan. 4, 2022), *report and recommendation adopted by* 2022 WL 718391 (E.D. Cal. Mar. 9, 2022) ("The CFTC has strong, congressionally mandated interests in enforcing the Act, obtaining restitution ... for victims of fraud, and deterring future wrongdoing through penalties, among other monetary relief. Yet the parties' refusal to appear and defend will continue to deprive the CFTC of the opportunity to obtain judgment on the merit.").)

**2. The Commission's Complaint States a Claim as to Each Defaulting Defendant (Eital Factors Two and Three).**

The *Eitel* factors two and three "require that a plaintiff state a claim on which [it] may recover." *Discovery Commc'n, Inc. v. Animal Planet, Inc.*, 172 F. Supp. 2d 1282, 1288 (C.D. Cal. 2001) (quoting *Danning*, 572 F.2d at 1388). At the default judgment stage, "the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *Geddes*, 559 F.2d at 560; *see also*, Fed. R. Civ. P. 8(b)(6).

Here, the Commission has alleged one count against each of the Defaulting Defendants – fraud by deceptive device or contrivance in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(a), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2023). (ECF No. 1, Compl., Count 1, ¶¶ 76-81.) The Commission also charged that each Defaulting Defendants willfully aided and abetted each others' fraudulent acts and practices in violation of 7 U.S.C. § 9(1) and Regulation 180.1(a), and they

are therefore liable for their codefendants' fraud pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a). (*Id.* ¶ 82.) The Commission has adequately pleaded those claims against each of the Defaulting Defendants.

**a. Defaulting Defendants Engaged in Fraud by a Deceptive Device or Contrivance (Count One).**

Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2023), broadly prohibit the use of deceptive or misleading devices in connection with a contract of sale of "any commodity in interstate commerce." Section 6(c)(1) of the Act makes it unlawful for any person, directly or indirectly, to: "[U]se or employ, or attempt to use or employ, in connection with . . . a contract of sale of any commodity in interstate commerce . . . any manipulative or deceptive device or contrivance, in contravention of [Regulation 180.1] . . . . " 7 U.S.C. § 9(a). Regulation 180.1(a) provides, in relevant part, that it shall be unlawful to

> "(1) [u]se or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) [m]ake, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or] (3) [e]ngage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . ."

Digital assets such as Bitcoin are commodities in interstate commerce. (ECF No. 1, Compl. ¶¶ 22, 79). They are encompassed in the definition of "commodity" under Section 1a(9) of the Act, 7 U.S.C. § 1a(9). *See*, *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 228 (E.D.N.Y 2018) (finding that "[v]irtual currencies" fall within the CEA's "definition of 'commodities' as 'all other goods and articles . . . in which [futures contracts] are presently or in the future dealt in.'"), *recons. denied*, 332 F. Supp. 3d 641, 650-51 (E.D.N.Y. 2018); *CFTC v. My Big Coin Pay, Inc.*, 334 F.

Supp. 3d 492, 495-98 (D. Mass. 2018) (same).[7]

To prove a violation of Section 6(c)(1) of the Act and Regulation 180.1(a)(1)-(3), the Commission must show that Defaulting Defendants: (1) engaged in prohibited conduct (i.e., employed a fraudulent scheme, made material misrepresentations or omissions, or engaged in a fraudulent business practice); (2) in connection with any a contract of the sale of a commodity in interstate commerce, a swap or a futures contract; (3) with scienter. *See, e.g.*, *CFTC v. McDonnell,* 332 F. Supp. 3d 641, 717 (E.D.N.Y. 2018)*; CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317, 1346-47 (S.D. Fla. 2014). *See also*, *CFTC v. Monex Credit Co*., 931 F.3d 966, 976 (9th Cir. 2019) (courts interpreting Section 6(c)(1) of the Act and Regulation 180.1(a) have looked to federal securities laws for guidance); *Gebhart v. SEC*, 595 F.3d 1035, 1040 & n. 8 (9th Cir. 2010) (discussing Rule 10b-5 requirements).[8]

**(i) <u>Defaulting Defendants Made Material Misrepresentations and Omissions and Misappropriated Funds</u>.**

Whether a misrepresentation or material omission has been made depends on the "overall message" and the "common understanding of the information conveyed." *CFTC v. RJ Fitzgerald & Co.,* 310 F.3d 1321, 1328-29 (11th Cir.2002). A statement or omission is material "if a reasonable investor would consider it

---

[7] *Cf. Ox Labs, Inc. v. Bitpay, Inc.*, No. CV 18-5934-MWF (KSx), 2020 WL 1039012, at *6 (C.D. Cal. Jan. 24, 2020) (citing with approval the conclusion in *CFTC v. McDonnell* that Bitcoin is a commodity under the CEA as additional support for the proposition that Bitcoin is "quasi-tangible property for the purposes of conversion[.]") Bitcoin also is commodity that underlies futures contracts trading on the CBOE Futures Exchange and the Chicago Mercantile Exchange. (Mucha Decl. ¶ 22.)

[8] Section 6(c)(1) of the Act and Regulation 180.1 both "explicitly prohibit fraud even in the absence of market manipulation." *My Big Coin Pay*, 334 F. Supp. 3d at 498-99; *see also*, *Monex Credit Co.*, 931 F.3d. at 977 (holding Section 6(c)(1) applies to "stand-alone fraud claims in the sale of leveraged commodities").

important in deciding whether to make an investment." *McDonnell*, 332 F. Supp. 3d at 720 (citing *CFTC v. S. Trust Metals, Inc.*, 894 F.3d 1313, 1327 (11th Cir. 2018) ).

Here, the allegations of the Complaint established that the overall message conveyed by Defaulting Defendants was that (i) that Defaulting Defendants and other Icomtech agents would use customer money to trade Bitcoin or other digital asset commodities on the customers' behalves; (ii) that Icomtech customers could achieve specific daily earnings; and (iii) that Icomtech customers' money would be doubled in approximately four to eight months. (ECF No. 1, ¶¶ 2, 34, 35, 45-46, 49, 50, 54, 80.b.) Yet, Defaulting Defendants did not trade Bitcoin or other digital asset commodities on the customers' behalves as represented, and did not earn daily returns or double the customers' investments based on trading. (*Id*. ¶¶ 3, 57, 59.) Instead, numerous Icomtech customers lost most if not all of their funds. (*Id*. ¶¶ 3, 6, 60-69.)

Defaulting Defendants also falsely promised referral commissions and bonuses, which customers never received. (*Id*. ¶¶ 4, 50, 54, 70-75.) And they failed to disclose or fully disclose in Icomtech's that customer funds would be used to further promote the scheme or otherwise for their collective benefit. (*Id*. ¶¶ 3, 58-59, 67, 73, 80.c.), and failed to disclose in written solicitations materials that customer money would be used to pay expenses and/or commissions and bonuses to Defaulting Defendants and other Icomtech agents. (*Id*. ¶¶ 5, 74-75.)

Courts have found misrepresentations or omissions concerning profit or risk material. *CFTC. v. Driver*, 877 F.Supp.2d 968, 977-78 (C.D. Cal. 2012)); *CFTC v. Capitol Equity FX LLC*, No. EDCV 17-743 JGB (SKx), 2017 WL 9565340, at *3-4 (C.D. Cal. July 31, 2017). Likewise, courts have found failures to disclose that customer funds are being used to pay excessive commissions or fees material. *See, e.g.*, *SEC v. Alliance Leasing Corp.*, No. 98-cv-1810 J (CGA), 2000 WL 35612001, at *8-9 (S.D. Cal. Mar. 20, 2000), *aff'd* 28 Fed.Appx. 648, 652 (9th Cir. 2002) (granting SEC's summary judgment motion: "We agree with the district court

that the 30% commissions were 'so obviously important to an investor, that reasonable minds cannot differ on the question of materiality.'" (citation to quotation omitted)); *SEC v. Lottonet Operating, Corp.,* No. 17-21033-CIV-LENARD/GOODMAN, 2017 WL 6949289, at *14 (S.D. Fla. Mar. 31, 2017) (Magistrate report recommending granting SEC's motion for preliminary injunction: "A reasonable investor would want to know" that contrary to representations defendants were not "spending investor funds to develop the Company, but were instead using 35 percent of investors' money to pay sales agents for soliciting their investments"), 2017 WL 6989148, at *1 (S.D. Fla. Apr. 6, 2017) (order adopting Magistrate report and recommendation and granting SEC's motion for preliminary injunction).

The Complaint also alleges that Defaulting Defendants misappropriated customer funds. (ECF No. 1, Compl. ¶¶ 3, 5-6, 58, 67, 74, 80.a.) "Misappropriation of customer funds constitutes fraud that violates Section 6(c)(1) of the Act and Regulation 180.1(a). *Mc Donnell*, 332 F. Supp. at 719; *see also*, *Driver,* 877 F. Supp. 2d at 978 (misappropriating participant funds constitutes "willful and blatant" fraud in violation of the anti-fraud provisions of Sections 4b(a)(2)(A) and (C), and 4*o* of the Act). The failure to disclose that fact constituted a material omission. *Capital Equity FX LLC*, 2017 WL 9565340, at * 4 .

Accordingly, the Complaint clearly alleges that Defaulting Defendants made material misrepresentations and omissions to further the Icomtech fraudulent scheme, and misappropriated customer funds.

**(ii) <u>The Fraud was in Connection with a Contract of Sale of a Commodity in Interstate Commerce</u>.**

"In interpreting the 'in connection with' requirement of the Commodities Exchange Act, courts generally look to interpretations of the 'in connection with' requirement of § 10(b) of the Securities Exchange Act." *Tatum v. Legg Mason Wood Walker, Inc.*, 83 F.3d 121, 123, n. 2 (5th Cir. 1996) (citing omitted); *Hirk v. Agri-*

*Research Council, Inc*., 561 F.2d 96, 103-104 (7th Cir. 1977); *see also, SEC v. Lee*, 720 F. Supp. 2d 305, 338 (S.D.N.Y. 2010) (addressing CFTC claims under Section 4c(b) of the Act and Regulation 33.10). Courts read the "in connection with" requirement "flexibly, not technically and restrictively." *Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12 (1971); *see also*, *R & W Tech. Servs. Ltd. v. CFTC*, 205 F.3d 165, 171-173 (5th Cir. 2000) (noting courts' broad interpretation of the "in connection with" language); *Hirk*, 561 F.2d at 103-104 (same). Accordingly, the "in connection with" requirement of Section 6(c)(1) of the Act and Regulation 180.1 is satisfied where fraud and a contract of sale of a commodity in interstate commerce coincide. *See SEC v. Zandford*, 535 U.S. 813, 818-26 (2002) (holding the "in connection with" requirement was satisfied where a broker sold customer securities and thereafter misappropriated the proceeds); *McDonnell*, 332 F. Supp. 3d at 722-23 ("The 'in connection with' requirement of Section 6(c)(1) of the Act and Regulation 180.1(a) is construed broadly. It is satisfied where the contract of sale of a commodity is in interstate commerce and the fraud are not independent events.").[9]

Here, the "in connection with" requirement is satisfied. Defaulting Defendants induced customers to give them funds by telling them their funds would be used by Icomtech to trade bitcoin and other digital assets commodities on their behalf, and misrepresenting the rate of return. (ECF No. 1, ¶¶ 2, 34, 35, 45-46, 49, 54.) Further, Carmona, Arellano, Valdez, and Brend each accepted or received customer funds for that purpose, either directly from customers, and/or by the transfer of the customer funds to them, or companies associated with them, by other Defaulting Defendants or Icomtech agents. (*Id*. ¶¶ 61-63.) This conduct satisfies the "in connection with" test.

---

[9] *See also*, Regulation 180.1 Final Rulemaking, 76 Fed. Reg. at 41405 (stating under Section 6(c)(1) and Rule 180.1, "[t]he Commission interprets the words 'in connection with' broadly, not technically or restrictively[.]").

*See McDonnell*, 332 F. Supp. 3d at 723 (holding that material misrepresentations and omissions and misappropriation of customer funds relating to proposed trading in virtual currency was in connection with contracts of sale of commodities in interstate commerce); *Hunter Wise*, 21 F. Supp. 3d at 1347-48 ("in connection with" requirement met where defendant misrepresented rate of return and risks, and victims testified that this information would have influenced their decision to purchase commodities.); *see also*, *SEC v. Wyly*, 788 F. Supp. 2d 92, 120 (S.D.N.Y. 2011) (holding that inducing the purchase of securities satisfies the "in connection with" element of SEC Rule 10b-5).

Accordingly, Defaulting Defendants' conduct as described above satisfies the "in connection with" requirement of Section 6(c)(1) of the Act and Regulation 180.1(a).

**(iii) <u>Defaulting Defendants Acted with Scienter</u>.**

Scienter may be established under Section 6(c)(1) of the Act and Regulation 180.1(a) by showing either that the Defaulting Defendants knew their statements were false or that they were reckless as to the statements' truth or falsity. *See* Regulation 180.1 Final Rulemaking, 76 Fed. Reg. at 41,404 (stating that intentional or "at a minimum" reckless conduct is required). "[T]he Commission defines recklessness as an act or omission that 'departs so far from the standards of ordinary care that it is very difficult to believe the actor was not aware of what he or she was doing.'" *Id*. (citation to quotation omitted); *see also*, *McDonnell*, 332 F. Supp. 3d at 721-22 (same); *cf.*, *R.J. Fitzgerald*, 310 F.3d at 1328 (scienter is established under 7 U.S.C. § 6b(a), "if Defendant intended to defraud, manipulate, or deceive, or if Defendant's conduct represents an extreme departure from the standards of ordinary care.").

The Ninth Circuit has articulated "a two-part inquiry for scienter" at the pleading stage under Section 10(b)(5) of the Securities Exchange Act: "first, [the court must] determine whether any of the allegations, standing alone, are sufficient to

create a strong inference of scienter; [and] second, if no individual allegation is sufficient, [the court] conduct[s] a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *New Mexico State Investment Council v. Ernst & Young LLP,* 641 F.3d 1089, 1095 (9th Cir.2010); *see also*, *Brown v. China Integrated Energy, Inc.*, 875 F.Supp.2d 1096, 1105-06 (C.D. Cal. 2012) (same). The creation of a "strong inference of scienter" means "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Brown*, 875 F.Supp.2d at 1106 (emphasis in original removed) (citation to quotation omitted).

Here, the allegations the Complaint are sufficient to create a "strong inference of scienter." (ECF No. 1, Compl. ¶ 80.) The Complaint alleges that (1) notwithstanding their clear representations to the contrary regarding trading and profit potential, Defaulting Defendants and their codefendant simply did not trade Bitcoin or other digital assets on the customers' behalves as they represented, and did not earn daily returns of between .09% and 2.8% or and double the customers' investments based on trading (*id*. ¶¶ 3, 6, 57, 59, 60-69); (2) instead of trading, customers funds they were used to further promote the scheme, to pay for personal expenses and to pay themselves commissions and bonuses (*id*. ¶¶ 3, 58-59, 67, 73); (3) customers complained to Carmona and Valdez that they were unable to withdraw their funds, and were assured that their funds were nonetheless safe (*id*. ¶¶ 65-67); and (4) the Defaulting Defendants communicated amongst themselves and other Icomtech about, among other things, rates of return and how to handle customer money, and coordinated their solicitations (*id*. ¶¶ 55-56).

Accordingly, the Complaint has alleged facts sufficient to demonstrate that Defaulting Defendants knew or should have known their statements about trading and profit potential were false, or acted in reckless disregard of their truth or falsity.

**b. Aiding and Abetting in Violation of 7 U.S.C. § 13c(a).**

Section 13(a) of the Act, provides: "Any person who commits, or willfully aids, abets, counsels, commands, induces or procures the commission of" a violation of the Act or Regulations "or who acts in combination or concert with any other person in any such violations . . . may be held responsible for such violations as a principal." 7 U.S.C. §13c(a). "A defendant will be found liable if [he] 'knowingly associates [himself] with an unlawful venture, participates in it to bring it about, and seeks by [his] actions to make it succeed.'" *Hunter Wise,* 21 F. Supp. 3d at 1348 (citation to quotation omitted); *CFTC v. Safevest, LLC*, No. SACV08-00474-JVS (MLGx), 2008 WL 5103202, at *2 (C.D. Cal. Dec. 1, 2008) (aiding and abetting liability established were defendant solicited customers to trade, misrepresented profits, and did not trade but instead misappropriated customer funds).

Here, the Complaint alleges that Defaulting Defendants, jointly doing business as Icomtech, all aided and abetted each other in the fraudulent conduct alleged. (ECF No. 1, Compl. ¶¶ 1, 8, 26, 34, 56, 59, 75, 80, 82.) In addition, the Complaint alleges that Defaulting Defendants (1) communicated with each other regarding, among other things, rates of return, solicitation materials, what to do with customer money (*id*. ¶ 55); (2) coordinated their solicitation activities (*id*. ¶ 56); (3) each engaged in fraudulent solicitation of customers (*id*. ¶¶ 2, 34, 35, 45-46, 49, 54); and (4) each accepted customer funds. (*Id*. ¶¶ 61-63.)

Accordingly, the CFTC has sufficiently alleged that Defaulting Defendants each aided and abetted each other.

**3. Sums of Money at Stake (*Eitel* Factor Four).**

The Court also may consider "the amount of money at stake in relation to the seriousness of Defendant's conduct." *PepsiCo, Inc. v. California Sec. Cans*, 238 F. Supp. 2d 1172, 1176 (C.D. Cal. 2002). Here, Defaulting Defendants' violations of the anti-fraud provisions constitute core violations of the Act and Regulations. *See* 7 U.S.C. § 3(b); *see also*, *supra,* p. 14. Given the seriousness of Defaulting

Defendants' conduct, the amount of money at stake — $1,098,920 in victim restitution, jointly and severally, and a $1,000,000 civil monetary penalty ("CMP") as to each Defaulting Defendant (*see* p. 10 *supra*, and pp. 26-29 *infra*) —does not warrant denying default judgment.[10]

As explained below, the imposition of both restitution and CMPs is authorized by the Act and Regulations, the restitution amount is directly tied to Icomtech customer victims, the CMP amount is reasonable in light of the conduct, and the amounts requested are less than prior default judgment awards in similar Commission actions. *See e.g.*, *CFTC v. Am. Bullion Exch. ABEX Corp.*, No. SACV10–1876 DOC (RNBx), 2014 WL 12603558, at *11 (C.D. Cal. Sept. 16, 2014) (entering default judgment for Commission and ordering civil monetary penalty exceeding $14 million); *CFTC v. Safevest, LLC*, No. SACV08–00474 JVS (MLGx), 2009 WL 2448116, at *2, 4-5 (C.D. Cal. July 13, 2006) (entering default judgment for the Commission and ordering, among other things, restitution of $17.8 million, and each defendant to pay a civil monetary penalty of $1 million); *cf. CFTC v. The Trade Tech Institute, Inc.*, No. CV 11–2163–GHK (PLAx), 2012 WL 13008332, at *2-5 (C.D. Cal. Jun. 19, 2021) (entering default judgment and ordering restitution of $2.3 million and civil monetary penalties ranging from approximately $1.2 million to $8.7 million).

**4. There is Minimal Possibility of Dispute Concerning Material Facts (*Eitel* Factor Five).**

There is a minimal possibility of a dispute concerning material facts because, in as much as the Defaulting Defendants never appeared, they have conceded

[10] Part III.C.2.a. below, *infra* p. 27, summarizes the CFTC's authority to seek restitution on behalf of fraud victims. *See also*, Mucha Decl. ¶¶ 10-21 & Ex. 1 (setting forth the restitution amount and the method of calculating it). Part III.C.2.b. below, *infra* p. 28, summarizes the CFTC's authority to request the imposition of CMPs.

allegation in the Complaint, which must be taken as true for purposes of this motion. *See* Fed. R. Civ. P. 8(b)(6); *see also, Sky Billards,* 2016 WL 6661175, at *5 (defendants' failure to respond "supports the conclusion that the possibility of a dispute as to the material facts is minimal").

**5. There is No Evidence of Excusable Neglect (Eitel Factor Six).**

Defaulting Defendants failures to respond to the Complaint are not the result of "excusable neglect." Each of them were properly served, but failed to answer plead, or defend this action. (Deacon Decl. ¶¶ 3-28.) Under the circumstances, there is no indication that any of the Defaulting Defendants' defaults are the result of excusable neglect. *See Halsey v. Colonial Asset Mgmt.*, No. 5:13-cv-02025 JGB (DTBx), 2014 WL 12601015, at *4 (C.D. Cal. July 17, 2014) ("Defendant was served with the summons and Complaint, but has failed to appear in this action. Therefore, there is no indication that Defendant's default is due to excusable neglect, or that the material facts are in dispute.").

**6. Policy Favoring Judgment on Merits Does Not Warrant Denying Default Judgment (*Eitel* Factor Seven).**

Although public policy favors a decision on the merits, Defaulting Defendants' "failure to answer Plaintiffs' Complaint makes a decision on the merits impractical, if not impossible." *PepsiCo, Inc.*, 238 F. Supp. 2d at1177. Accordingly, the policy favoring decisions of cases on the merits does not warrant denying default judgment in this instance.

**C. Remedies and Damages.**

**1. Permanent Injunction.**

Section 6c(a) of the Act, 7 U.S.C. § 13a-1, entitles the CFTC to a permanent injunction "upon a showing that a violation [of the Act or Regulations] has occurred and is likely to continue unless enjoined.'" *Main and Prospect Capital,* 2022 WL 17666395 at *6 (quoting *Driver*, 877 F. Supp. 2d at 981). Accordingly, "[o]nce a violation of the Act has been shown, the moving party need only show the existence

of some reasonable likelihood of future violations." *Id*. (citations to quotation omitted). "The Court may infer a likelihood of future violations of the Act and Regulations from past unlawful conduct." *Id.* at *6 (citation omitted). In deciding whether to issue a permanent injunction, the Court may also consider "the egregiousness of the defendant's actions, whether the violation was isolated or recurrent, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of his conduct's wrongfulness, and the likelihood that the defendant's occupation will present opportunities for future violations." *Driver*, 877 F. Supp. 2d at 981-82.

Defaulting Defendants' conduct as alleged in the Complaint was neither isolated nor accidental. They engaged in egregious and systematic violations of the Act and Regulations by fraudulently soliciting and defrauded at least 190 customers out of $1,098,920. It is therefore proper for the Court to infer from this pattern of wrongdoing the likelihood of future violations unless permanently enjoined by the Court. Accordingly, the Commission seeks an injunction prohibiting Defaulting Defendants from future violations of Section 6(c) of the Act and Regulation 180.1. *See United States v. Miller*, 588 F.2d 1256, 1261 (9th Cir. 1978) (injunctions tracking the statutory language are permissible so long the "statutory terms adequately describe the impermissible conduct."); *F.T.C. v. EDebitPay, LLC*, 695 F.3d 938, 944 (9th Cir. 2012) (no *per se* rule in 9th Circuit against "obey the law" injunctions) (citing *U.S. v. Miller*, 588 F.2d at 1261).)

In addition, the Commission seeks permanent trading and registration bans. Commission precedent has established that trading prohibitions are appropriate "where there is a nexus between the violation and the integrity of the futures market." *Reddy v. CFTC*, 191 F.3d 109, 127 (2d Cir. 1999); *In re Staryk*, CFTC No. 95-5, 2004 WL 1657544, at *12 (July 23, 2004); *see also*, *In re Miller*, CFTC No. 92-4, 1995 WL 368601, at *4 (June 16, 1995) (same) (citing *Monieson v. CFTC*, 996 F.2d 852, 863 (7th Cir. 1992)), *aff'd in relevant part sub nom. Miller v. CFTC*, 197

F.3d 1227 (9th Cir. 1999)).[11] The term of the prohibition turns on the gravity of the violations. *Miller,* 1995 WL 368601, at *4 (imposing permanent prohibition upon associated person (as defined in the Act) who had engaged in solicitation fraud over a period of years); *In re Staryk*, 2004 WL 1657544, at *12 ("[p]ermanent trading prohibitions are . . . reserved for conduct that is 'both intentional and egregious." (citation omitted)); *see also*, *CFTC v. Crombie*, No. 4:11-cv-04577-CW, 2019 WL 3403591, at *3 (N.D. Cal. June 5, 2019) (holding "fraud is one of the primary threats to market integrity" and thus personal "[p]ermanent trading, solicitation and registration bans are appropriate when a defendant's violation of the [Act] and/or Regulations poses a threat to the integrity of the markets regulated by the CFTC" (quoting *CFTC v. Harrison*, 255 F. Supp. 3d 645, 646-47 (D.S.C. 2015))), *aff'd*, 859 Fed. App'x 840 (9th Cir. Sept. 21, 2021). Accordingly, permanent trading and registration bans are appropriate here as to Carmona, Arellano, Valdez and Brend given the intentional, extent, and egregious nature of the fraud, and its consequent threat to market integrity.

Trading and registration bans are also appropriate as to Carmona, Arellano and Brend given their felony convictions based upon the same type of conduct alleged in the Complaint. Section 9b of the Act, 7 U.S.C. § 13(b), creates a presumption that convicted felons shall be denied registration for five years "or such longer period as the Commission may determine," as well as barred from participating in the markets.

**2. Restitution, Civil Monetary Penalty, and Post-Judgment Interest.**

While the Court must make a determination regarding the damages requested in a motion for default judgment, the Court is "not required to conduct an evidentiary hearing to ascertain damages" where evidence of damages has been

[11] "The [Act] is a remedial statute that serves the crucial purpose of protecting the innocent individual investor—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived." *RJ Fitzgerald & Co.,* 310 F.3d at 329.

provided. *Garden City Boxing Club, Inc. v. Aranda*, 384 Fed. App'x 688, 689 (9th Cir. 2010). The Court may rely on declarations in lieu of a damages hearing. *See, e.g., CFTC v. Emerald Worldwide Holdings, Inc.*, No. CV03-8339AHM, 2005 WL 1130588, at *13 (C.D. Cal. Apr. 19, 2005) (finding "no reason to hold an evidentiary hearing on damages" because CFTC-submitted documentary evidence was "sufficient" to enter default judgment). The Commission's burden in proving up damages "is relatively lenient" and need "only prove that the compensation sought relates to the damages that flow naturally from the well-pleaded injuries." *SEC v. Pedras*, No. CV 13–7932 GAF (MRWx), 2014 WL 12597332, at *8 (C.D. Cal. Apr. 16, 2014) (citations omitted).

**a. Restitution.**

Section 6c(d)(3)(A) of the Act authorizes the Commission to seek, and the Court to impose, equitable remedies for violations of the Act, including "restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses)." 7 U.S.C. § 13a-1(d)(3)(A). Restitution exists to "restore the status quo" and reflects "the difference between what defendants obtained and the amount customers received back . . . ." *Driver*, 877 F. Supp. 2d at 981; *see also*, *CFTC v. Leighton,* No. 2:12–cv–04012-PSG-SS, 2013 WL 4101874, at *9 (C.D. Cal. July 8, 2013) (ordering restitution equal to the "net losses to pool participants"); *Emerald Worldwide*, 2005 WL 1130588, at *10 ("[t]he appropriate amount of restitution is the total amount invested by customers, less refunds made by the defendants to the customers.").

Here, as set forth in the attached Mucha Declaration, Defaulting Defendants' illegal conduct caused Icomtech customers to incur net losses totaling $1,098,920. (Mucha Decl. ¶¶ 10-14, 19-21.) This sum reflects the total principal amount of funds invested by the 190 customers, minus the funds returned. (*Id.* ¶¶ 19-21.) Accordingly, the CFTC requests that the Defaulting Defendants should be ordered to

pay $1,098,920 in restitution, jointly and severally, plus post-judgment interest.[12]

**b. Civil Monetary Penalty.**

Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), and Regulation 143.8(b)(1), 17 C.F.R. § 143.8(a)(b)(1) (2023), authorize the Commission to seek a civil monetary penalty not more than the greater of triple the monetary gain to the person for each violation of the Act or Regulations, or $140,000 (adjusted for inflation to $221,466)[13] per violation. The Court may "fashion a civil monetary penalty appropriate to the gravity of the offense and sufficient to act as a deterrent." *CFTC v. Trimble*, No. 11–cv–02887-PAB-KMT, 2013 WL 317576, at *9 (D. Colo. Jan. 28, 2013) (*citing Miller*, 197 F.3d at 1236); *see also*, *Driver*, 877 F. Supp.2d at 982-83 ("'Civil monetary penalties are also exemplary; they remind both the recipient of the penalty and other persons subject to the Act that noncompliance carries a cost.'" (citation to quotation omitted).) The Court considers numerous factors in determining an appropriate civil monetary penalty for violations of the Act and Regulations, including the nature of the violations, whether defendants acted with scienter, the consequences of the violations, the financial benefits to defendants, and the harm to customers. *CFTC v. Am. Bullion Exch. ABEX Corp.*, No. SACV 10-01876 DOC (RNBx), at *18 (C.D. Cal. Aug. 7, 2014) (citing *CFTC v. Arrington*, No.

---

[12] The CFTC anticipates that restitution also will be ordered against defendants, including the Defaulting Defendants here, in the parallel Criminal Case. Several of them, including Arellano, already entered into consent preliminary forfeiture orders in that action. (Deacon Decl. ¶¶ 32, 38 (noting that, in the Criminal Case, (i) Arellano entered into a consent preliminary forfeiture of $1,744,474.00 (*id*. ¶ 32), and (ii) Ruiz Ochoa, named in both the Complaint and the Indictment in the Criminal Case, entered into a consent preliminary forfeiture of $914,000 (*id*. ¶ 38).) Accordingly, the attached Proposed Order of Final Judgment by Default as to the Defaulting Defendants contains a provision allowing for a dollar-for-dollar credit for any restitution ordered and collected in the parallel Criminal Case.

[13] 17 CFR 143.8(b)(1). *See also*, https://www.cftc.gov/LawRegulation/InflationAdjustedCivilMonetaryPenalties/index.htm.

8:11CV181, 2014 WL 685331, at *21-22 (D. Neb. Jan. 28, 2014)). This District has determined that "a high civil monetary penalty is warranted where customers have been defrauded of a substantial amount of money." *Driver*, 877 F. Supp. 2d at 982.

Here, Defaulting Defendants, jointly doing business as Icomtech, each acting with scienter, and each aiding and abetting each other, defrauded at least 190 customers of $1,098,920, and used customer funds for Defaulting Defendants' collective benefit. Thus, the CFTC submits that that is the amount of the monetary gain to Defaulting Defendants. Accordingly, the CFTC requests that this Court impose a CMP of $1,000,000 as to each Defaulting Defendant. This amount is reasonable and appropriate given the seriousness of the misconduct, the number of victims defrauded, and the amount of the loss. It essentially represents one times the monetary gain, as rounded down, and thus is far below the amount the CFTC may request pursuant to statute.[14]

**c. Post-Judgment Interest.**

The Commission is entitled to post-judgment interest on any restitution and civil monetary penalty awards ordered by this Court. *See* Judiciary and Judicial Procedure § 1961(a), 28 U.S.C. § 1961(a).

[14] As noted, the statute permits the CFTC to seek as to each Defaulting Defendants (who at all time alleged in the Complaint aided and abetted each other) triple the monetary gain. It also permits the CFTC to seek $221,466 for each and every violation of the Act (by way of possible example, $221,466 times each of the 190 victims).

## IV. CONCLUSION

For the foregoing reasons, the Commission respectfully requests that Court grant the Commission's Motion, enter final judgment by default against Defaulting Defendants, and issue a final order in the form of the proposed Order submitted herewith.

Dated: August 13, 2024

Respectfully Submitted,

COMMODITY FUTURES TRADING COMMISSION

Attorneys for Plaintiff

By: <u>/s/ *Kathleen M. Banar*</u>

JAMES H. HOLL, III (CA Bar No. 177885)
jholl@cftc.gov
KATHLEEN M. BANAR, *pro hac vice*
kbanar@cftc.gov
JAMES W. DEACON, *pro hac vice*
jdeacon@cftc.gov

COMMODITY FUTURES TRADING COMMISSION
1155 21st NW
Washington, DC 20581
(202) 418-5311 / (202) 418-5523 (fax)

## CERTIFICATE OF COMPLIANCE

I, the undersigned counsel of record for Plaintiff Commodity Futures Trading Commission, hereby certify that the Memorandum of Points and Authorities attached to and in Support of Plaintiff's Notice of Motion and Motion for Final Judgment by Default Against David Carmona, Juan Arellano Parra, Moses Valdez, and David Brend contains 30 pages/9,390 words, excluding the table of contents, the table of authorities, and the signature block, which complies with the pages/words limit authorized by this Court's Order dated August 9, 2024 (ECF No. 81) granting the Plaintiff's *Ex Parte* Application for Leave to Exceed 20 Pages/5,600 Words Limitation Contained in Rule 6 of the Court's May 26, 2023 Standing Order Regarding Newly Assigned Cases.

By: /s/ *Kathleen M. Banar*
Kathleen M. Banar

Attorney for Plaintiff Commodity Futures Trading Commission

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2024, I caused Plaintiff Commodity Futures Trading Commission's (i) Notice of Motion and Motion for Final Judgment by Default For Permanent Injunction, Restitution, Civil Monetary Penalties, and Other Equitable Relief Against David Carmona (a/k/a David Segundo Carmona a/k/a Wuilver Segundo), Juan Arellano Parra, Moses Valdez, and David Brend; (ii) Memorandum of Points and Authorities in Support; (iii) Declaration of James W. Deacon and exhibits thereto, and Declaration of Kara L. Mucha and exhibit thereto; and (iv) Proposed Order to be served on all counsel of record through the Court's ECF filing system and on the following Defendants, who have not yet appeared in the action, via FedEx:

David Brend
[Home address redacted pursuant to L.R. 5.2-1]
Tampa, FL 33647-3342

David Carmona
USMS/Register No. 91480-054
MDC Brooklyn
80 29th Street
Brooklyn, NY 11232

Juan Arellano Parra
Hudson County Correctional Center
30-35 Hackensack Avenue
Kearny, NJ 07032

Moses Valdez
[Home address redacted pursuant to L.R. 5.2-1]
Hesperia, CA 92345

By: /s/ *Kathleen M. Banar*
Kathleen M. Banar

Attorney for Plaintiff Commodity Futures Trading Commission