**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

COMMODITY FUTURES TRADING COMMISSION,
Plaintiff,
v.
DAVID CARMONA, et al.,
Defendants.

Case No. 2:23-cv-04015-MRA-RAO

**ORDER GRANTING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANTS DAVID CARMONA, JUAN ARELLANO PARRA, MOSES VALDEZ, AND DAVID BREND [ECF 82]**

Before the Court is Plaintiff Commodity Futures Trading Commission's Motion for Default Judgment against Defendants David Carmona, Juan Arellano Parra, Moses Valdez, and David Brend (the "Motion"). ECF 82. The Court read and considered the Motion and held a hearing on September 12, 2024. ECF 88. For the reasons stated herein, the Court **GRANTS** the Motion.

///
///
///
///
///
///

## I. BACKGROUND[1]

Plaintiff Commodity Futures Trading Commission (the "CFTC") filed this case on May 24, 2023. ECF 1. The CFTC alleges that Defendants David Carmona ("Carmona"), Juan Arellano Parra ("Arellano Parra"), Moses Valdez ("Valdez"), David Brend ("Brend"), and Marco A. Ruiz Ochoa ("Ruiz Ochoa") (collectively, "Defendants"), individually and jointly doing business as Icomtech, "engaged in a multi-level marketing scheme involving the fraudulent solicitation of customer funds through false representations" from at least August 2018 through at least December 2019 (the "Relevant Period"). *Id.* ¶ 1.

Carmona, Ruiz Ochoa, and other "founders" created Icomtech. *Id.* ¶ 19. Carmona, Valdez, Arellano Parra, and Ruiz Ochoa, among others, were Icomtech's "Main Leaders." *Id.* ¶ 23. The website "icomtech.org" identified Valdez and Brend as part of the Icomtech "TEAM." *Id.* During the Relevant Period, Icomtech was not registered as a business entity in the United States. *Id.* ¶ 20. Defendants have never been registered with the CFTC. *Id.* ¶¶ 14-18. Throughout the Relevant Period, Defendants did business and operated and marketed Bitcoin and other digital asset commodity trading, among other things, to U.S. persons under the name Icomtech. *Id.* ¶ 21.

Icomtech's promotional materials "claimed that Icomtech was a company 'with the mission to create the largest exchange in the world' for the purposes of buying and selling cryptocurrency, including Bitcoin." *Id.* ¶ 24. Icomtech's stated goal was to become like other major cryptocurrency exchanges, including Coinbase, Binance, and Bitmex. *Id.* Carmona was touted in these promotional materials as someone who had made a fortune

---

[1] "The general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977) (citations omitted). Under Federal Rule of Civil Procedure 52, "a district court must set forth findings of fact and conclusions of law supporting an order granting an injunction." *See Fed. Trade Comm'n v. Enforma Natural Prods., Inc.*, 362 F.3d 1204, 1212 (9th Cir. 2004). The facts summarized in this section therefore constitute the Court's findings of fact pursuant to Rule 52(a). To the extent facts are included in the discussion portion of this Order, they are also deemed the Court's findings of fact.

trading cryptocurrency. *Id.* Other promotional materials pitched Icomtech as "a technological institution based on Bitcoin" and encouraged customers to "be part of this revolution of transactions in Bitcoin" by trading Bitcoin through Icomtech. *Id.* ¶ 25. Defendants solicited customers and prospective customers to invest their money with Icomtech and allow Icomtech to trade Bitcoin and other digital asset commodities on behalf of the customers. *Id.* ¶ 26.

During the Relevant Period, Icomtech maintained two websites associated with its business operations: "icomtech.io" and "icomtech.org." *Id.* ¶ 28. Once a solicited customer transferred funds to an Icomtech agent, the agent would create an online account for the customer through the Icomtech websites, issue the customer a user ID and temporary password, and email the customer a link with a user ID and temporary password. *Id.* ¶ 29. During the Relevant Period, customers routinely accessed their account information through the website, including account statements reflecting account purported earnings and Defendants' supposed trading on behalf of customers. *Id.* ¶¶ 30, 31. The "icomtech.org" website also allowed customers to log into their account to perform other account-related functions through either the website or a smartphone. *Id.* ¶ 32. Customers were generally told that they could withdraw their funds through the website or a smartphone app beginning six months after deposit or after a minimum amount of $150 in earnings had accrued. *Id.* ¶ 33.

During the Relevant Period, Defendants, individually and jointly, solicited actual and prospective Icomtech customers through the following means: (a) at in-person meetings at customers' homes, (b) at Icomtech promotional events, (c) in Icomtech presentation slides and documents circulated at promotional events, (d) via YouTube and other presentations posted online, (e) on virtual meetings, and (f) by word-of-mouth. *Id.* ¶ 34. Defendants and other Icomtech representatives represented to customers that Icomtech would (1) trade Bitcoin and other digital asset commodities on behalf of the customers, (2) provide daily returns from the trading of between 0.9% to 2.8%, (3) double the customers' money in approximately four to eight months, and (4) allow customers to

access their earnings via the websites. *Id.* ¶ 35. With written promotional presentations and pitches predominantly in Spanish, Defendants targeted Spanish-speaking individuals and their communities. *Id.* ¶ 36. The promotional materials also explained that Icomtech offered as many as eight "Packages" that customers could purchase for set amounts ranging from an upfront payment of $300 up to $20,000. *Id.* ¶ 52. Packages were purchased predominantly through cash payment to one or more Defendants or other Icomtech agents. *Id.* Defendants and other Icomtech agents also incentivized customers to recruit others to invest with Icomtech through commissions and "bonus points" *Id.* ¶¶ 70-71.

Icomtech promotional materials listed 10 Icomtech promotional events between January 6, 2019, and September 18, 2019, at various locations in southern California, Las Vegas, Nevada, and Tampa, Florida. *Id.* ¶ 37. On some occasions, hundreds of people attended these promotional events. *Id.* ¶ 38. Carmona, Valdez, and Arellano Parra, among other Icomtech agents, were specifically identified by name and/or pictured in advertisements for these promotional events. *Id.* ¶ 39. Valdez, Arellano Parra, and Ochoa Ruiz, as well as other Icomtech agents, organized the conference rooms, hotel rooms, and other services for the promotional events. *Id.* ¶ 41. At each of these promotional events, one or more of the Defendants made fraudulent misrepresentations to customers and prospective customers. *Id.* ¶ 40.

Carmona and Ruiz drafted or assisted in drafting Icomtech promotional materials containing fraudulent misrepresentations. *Id.* ¶ 42. Valdez hosted a WhatsApp group chat titled "Bitlionaires LA," which contained links to Icomtech advertisements, meeting notices, presentations, and videos. *Id.* ¶ 43. A flyer posted to the WhatsApp chat advertising an April 2, 2019, promotional event in Commerce, California stated, "Icomtech offers you the opportunity to have your own cryptocurrency business. You can generate thousands of dollars in digital gold . . . ." *Id.* ¶ 44. At least one Icomtech presentation and one advertisement posted in the WhatsApp chat contained the claim "Double by Trading" and that money could be doubled in approximately 140 days. *Id.* ¶¶ 45, 46. Brend claimed in a YouTube video presentation entitled "Icomtech English Presentation 2019" that

Icomtech used trading "algorithms" to "consistently" generate gains and "create a standard revenue" for Icomtech. *Id.* ¶ 48. Brend also stated that customers' money would "double in roughly between six and eight months." *Id.* ¶ 49. Carmona and Ruiz claimed at a promotional event that Icomtech used "sophisticated algorithms" to place trades. *Id*. ¶ 50. Arellano Parra and other Icomtech agents solicited a California customer in summer 2019, telling the customer that their money could be doubled in 120 days. *Id.* ¶ 51. Defendants communicated amongst themselves and with other Icomtech agents about Icomtech's operations, customers, and solicitations during the Relevant Period. *Id.* ¶ 55. Defendants coordinated their solicitation activities by attending and presenting at the same promotional events and using the same or similar solicitation materials and pitches. *Id.* ¶ 56.

Notwithstanding the representations made to customers, defendants (1) did not trade Bitcoin or other digital asset commodities on behalf of the customers, (2) did not earn daily returns of between .09% and 2.8%, and (3) did not double the customers' money from trading. *Id.* ¶ 57. Instead, Defendants used customer funds to promote the scheme, pay for personal expenditures, and compensate themselves and other Icomtech agents with commissions and bonuses. *Id.* ¶ 58. The written materials provided to customers did not fully disclose that customer money would be used to pay expenses and commissions and bonuses to Defendants and other Icomtech agents. *Id.* ¶ 74. During the Relevant Period, Carmona, Valdez, Arellano Parra, and Brend received customer funds directly from customers, from companies associated with certain Defendants, or from other Defendants and Icomtech agents. *Id.* ¶¶ 62-63. Beginning in the late summer of 2019, some customers attempted to withdraw their account balances but were unable to do so with limited exceptions. *Id.* ¶ 64. When confronted by customers, Carmona and Valdez, as well as other Icomtech agents, provided various excuses as to why customers' money could not be immediately withdrawn. *Id.* ¶ 66.

Despite assurances, Defendants misappropriated some, if not all, the customer funds sent to Icomtech. *Id.* ¶ 67. Some, but not all, customers who recruited other customers for Icomtech as part of its multi-level marketing scheme also did not receive referral

commissions or bonuses. *Id.* ¶¶ 72-73. At least 190 customers transferred a net total of $1,098,920.00 to Icomtech agents. ECF 82-2 ¶ 21, Ex. 1.

On October 13, 2022, the federal government criminally indicted Carmona, Arellano Parra, Valdez, Ruiz Ochoa, Brend, and others with wire fraud in connection with the Icomtech scheme in *United States v. Carmona*, No. 1:22-cr-00551-JLR (S.D.N.Y. Oct. 13, 2022) (hereinafter, the "Criminal Action"). *Id.* ¶ 27; ECF 82-1 (Deacon Decl.) ¶ 29, Ex. 1. Carmona pleaded guilty to wire fraud on December 22, 2023, and he is in federal custody. ECF 82-1 ¶¶ 30-31, Ex. 2. On October 4, 2024, Carmona was sentenced to 121 months' imprisonment. Criminal Action, ECF 280. On February 29, 2024, Arellano Parra pleaded guilty to two counts contained in a superseding information (Count I as to wire fraud and Count II as to money laundering) in the criminal case. ECF 82-1 ¶ 32, Ex. 2. He was scheduled to be sentenced on September 17, 2024. *Id.* ¶¶ 32-33, Ex. 2. On March 14, 2024, following a criminal trial, Brend was convicted of wire fraud. *Id.* ¶ 36, Ex. 2. Brend is out on bond, *Id.* ¶ 36, and he is scheduled to be sentenced on November 22, 2024, Criminal Action, ECF 296. The criminal charges against Valdez are still pending, and he remains out on bond. ECF 82-1 ¶¶ 34, 35.

In this case, Brend, Valdez, Arellano Parra, and Ruiz Ochoa were personally served with the Complaint and Summons in June 2023. ECF 20, 21, 22, 23. On July 7, 2023, the CFTC filed an Application for Entry of Default against Brend, Valdez, Arellano Parra, and Ruiz Ochoa. ECF 30. Default was entered as to Brend, Valdez, Arellano Parra, and Ruiz Ochoa on July 7, 2023. ECF 37. On July 11, 2023, Brend, proceeding *pro se*, filed a Notice and Acknowledgment of Receipt of Summons and Complaint. ECF 32. On July 14, 2023, Brend also filed an Appearance of Counsel, which appeared to contain a response to the allegations made in the Complaint. ECF 35. The Court (Hon. R. Gary Klausner, presiding) struck both documents as "improper" methods of appearance. ECF 33, 36. The Court directed Brend to consult the Court's *pro se* clinic and its website to learn about appropriate filings and procedure in federal court. ECF 36 at 1. Brend did not refile a notice of appearance or otherwise indicate that he would proceed *pro se*. On August 8,

2023, Ruiz Ochoa filed a Stipulation to Set Aside Clerk's Default Judgment against him. ECF 41. On August 9, 2023, the Court granted the stipulation, setting aside and vacating the default entered by the Clerk against Ruiz Ochoa. ECF 42.

Carmona was served with the Complaint and Summons on September 26, 2023. ECF 56. On May 1, 2024, the CFTC filed an Application for Entry of Default against Carmona. ECF 64. The Clerk issued a notice of deficiency as to the application, requiring the CFTC to file an amended application correcting the error. ECF 65. The CFTC filed an amended Proof of Service and an amended Application for Entry of Default against Carmona. ECF 68, 69. The Clerk entered default as to Carmona on May 22, 2024. ECF 70.

On August 13, 2024, the CFTC filed the instant Motion, seeking judgment by default for a permanent injunction, restitution, civil monetary penalties, and other equitable relief against Carmona, Arellano Parra, Valdez, and Brend (collectively, the "Defaulting Defendants"). ECF 82. The CFTC caused its Motion and supporting papers to be served on Defaulting Defendants by overnight mail. *Id.* at 43; *see also* ECF 89-1 (Banar Decl.) ¶¶ 3-4, Exs. A-D. Defaulting Defendants, including Brend, did not file any oppositions to the Motion. The Court held a hearing on the Motion, as noticed, on September 12, 2024. ECF 88. Appearing remotely was Counsel for the CFTC. *Id.* Defaulting Defendants were not present. *Id.*

At the hearing, the Court requested supplemental briefing on whether Defaulting Defendants' in-custody status limited the Court's ability to enter default judgment. *See id.* Counsel for the CFTC also raised a potential issue with service of its Motion on Valdez. Specifically, the delivery receipt that the CFTC received showed that, although the CFTC had given the carrier Valdez's home address in Hesperia, California, the package had been delivered to a different address in Hesperia, California. ECF 89-1 ¶¶ 5, 8. The CFTC informed the Court that it learned of this error in preparation for the hearing on the Motion. *Id.* ¶¶ 6, 8. On September 11, 2024, the CFTC caused the Motion and supporting papers to be served on Valdez by Federal Express, overnight delivery, at his home address in

Hesperia, California. *Id.* ¶¶ 7, 8. On September 12, 2024, the CFTC received a receipt showing delivery at Valdez's home address. *Id.* ¶ 7, Ex. E. This prompted the Court to request proof of supplemental service. *Id.* The CFTC filed proof of supplemental service and its supplemental brief on September 18, 2024.[2] ECF 89, 90.

## II. DISCUSSION

### A. Jurisdiction

"When entry of judgment is sought against a party who has failed to plead or otherwise defend, a district court has an affirmative duty to look into its jurisdiction over both the subject matter and the parties." *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999); *see also Timbuktu Educ. v. Alkaraween Islamic Bookstore*, No. 06-CV-03025-JSW, 2007 WL 1544790, at *2 (N.D. Cal. May 25, 2007).

The Court has subject matter jurisdiction over this action. The CFTC's single claim of fraud by deceptive device or contrivance pursuant to section 6(c)(1) of the Commodity Exchange Act (the "CEA") and corresponding CFTC Regulation 180.1 falls within the Court's original jurisdiction. *See* 28 U.S.C. §§ 1331, 1345. Moreover, under the CEA, district courts have jurisdiction to hear actions brought by the CFTC for injunctive relief "whenever it shall appear to the [CFTC] that any registered entity or other person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of [the CEA]." 7 U.S.C. § 13a-1.

---

[2] Having reviewed Plaintiff's supplemental briefing, the Court is satisfied that Carmona's and Arellano Parra's in-custody status, by itself, does not preclude the entry of default judgment as to them. *See Jones v. Phipps*, 39 F.3d 158, 163 (7th Cir. 1994) (finding that district court did not abuse its discretion in holding that "neither [a defendant]'s incarceration nor lack of an attorney—alone or combined—a sufficient basis upon which to premise either a finding of 'good cause' for setting aside default or the required 'excusable neglect' under Rule 60(b)(1)"); *see also United States v. 6611 S. Ingleside*, 70 F.3d 1275 (table), 1995 WL 687658, at *3 (7th Cir. 1995) ("Simple incarceration does not automatically render a prisoner incapable of representing his or her own interests in litigation."). Moreover, here, there is substantial evidence that Defaulting Defendants have actual notice of this suit and have had an opportunity to respond. *See* ECF 90 at 7 n.2.

"For a court to exercise personal jurisdiction over a defendant, there must be an 'applicable rule or statute [that] potentially confers jurisdiction over the defendant.'" *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1177 (9th Cir. 2004) (quoting *Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.*, 551 F.2d 784, 787 (9th Cir. 1977)). "A statutory basis for exercising personal jurisdiction may be found in a statute providing for service of process." *Id.* The CEA authorizes nationwide service of process. *See Cox v. CoinMarketCap OPCO, LLC*, 112 F.4th 822, 833 (9th Cir. 2024). "The exercise of personal jurisdiction must [also] 'accord with constitutional principles of due process." *Action Embroidery*, 368 F.3d at 1180 (quoting *Securities Inv. Prot. Corp. v. Vigman*, 764 F.2d 1309, 1314 (9th Cir. 1985)). "[D]ue process is satisfied when the forum state has 'minimum contacts' with a defendant." *Id.* Where a statute provides for nationwide service of process, the "minimum contacts" inquiry turns on "whether the defendant has acted within any district of the United States or sufficiently caused foreseeable consequences in this country." *Cox*, 112 F.4th at 834 (quoting *Action Embroidery*, 368 F.3d at 1180). Because Defaulting Defendants reside in the United States, *see* ECF 1 ¶¶ 14-18, Defaulting Defendants clearly have sufficient minimum contacts with the United States and are subject to the Court's general jurisdiction. *See Ford Motor Co. v. Montana Eight Jud. Dist. Ct.*, 592 U.S. 351, 358-59 (2021) ("In what we have called the 'paradigm' case, an individual is subject to general jurisdiction in her place of domicile." (citation omitted)). With constitutional principles of due process satisfied, the Court finds that personal jurisdiction over Defaulting Defendants is proper.

**B. <u>Procedural Requirements</u>**

In this district, the Local Rules require that the application for default judgment be accompanied by a declaration in compliance with Rule 55(b) and include the following information:

> (a) when and against what party the default was entered; (b) the identification of the pleading to which default was entered; (c) whether the defaulting party is an infant or incompetent person; (d) that the Servicemembers Civil Relief Act (50 U.S.C. App. § 521) does not apply; and (e) that notice has been served

> on the defaulting party, if required by Federal Rule of Civil Procedure 55(b)(2).

L.R. 55-1.

Here, Plaintiff has complied with the procedural requirements for an application for default judgment. Plaintiff submitted detailed declarations of James W. Deacon, the CFTC's Senior Trial Attorney, and Kara L. Mucha, a CFTC futures investigator, containing the information required under Local Rule 55-1. ECF 82-1 (Deacon Decl.) ¶¶ 2, 3-28, 39, 40; ECF 82-2 (Mucha Decl.) ¶¶ 23, 24. Since Default Defendants have not appeared in this action, Plaintiff was not required to provide them with written notice of this Motion. *See* Fed. R. Civ. P. 55(b)(2); *see also id.* 5(a)(2). Nevertheless, Plaintiffs served the Notice of Motion and Motion on Defaulting Defendants. ECF 82 at 43.

**C. <u>The *Eitel* Factors</u>**

Pursuant to Federal Rule of Civil Procedure 55(b), the Court may, upon motion, order default judgment following the entry of default by the Clerk. The rendering of default judgment is committed to the discretion of the district court. *See Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). "[D]efault judgments are ordinarily disfavored," and "[c]ases should be decided upon their merits whenever reasonably possible." *NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 616 (9th Cir. 2016) (quoting *Eitel v. McCool*, 782 F.2d 1470, 1472 (9th Cir. 1986)). The Ninth Circuit has instructed district courts to consider the following factors in deciding whether to enter default judgment:

> (1) the possibility of prejudice to a plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel*, 782 F.2d at 1471-72.

***1. Possibility of Prejudice to Plaintiff***

The first factor "considers whether the plaintiff will suffer prejudice if default judgment is not entered." *See PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002). The CFTC is mandated "to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets." 7 U.S.C. § 5(b); *see also Commodity Futures Trading Comm'n v. Fin. Tree*, No. 2:20-cv-01184-TLN-AC, 2022 WL 36416, at *12 (E.D. Cal. Jan. 4, 2022), *R & R adopted by* 2022 WL 718391 (E.D. Cal. Mar. 9, 2022) ("The CFTC has strong, congressionally mandated interests in enforcing the [CEA], obtaining restitution and disgorgement for victims of fraud, and deterring future wrongdoing through penalties, among other monetary relief."). Defaulting Defendants have not appeared in this action, such that "[a]bsent entry of default judgment, the CFTC would be prejudiced by its inability to enforce federal commodities laws efficiently and effectively." *Commodity Futures Trading Comm'n v. Main & Prospect Cap., LLC*, No. 2:19-cv-09736-FLA-AFM, 2022 WL 17666395, at *4 (C.D. Cal. Aug. 22, 2022); *see also Fin. Tree*, 2022 WL 36416, at *12 ("[T]he Parties' refusal to appear and defend will continue to deprive the CFTC of the opportunity to obtain judgment on the merits."). This factor favors default judgment.

***2. Merits of Plaintiff's Substantive Claims and Sufficiency of Complaint***

The second and third *Eitel* factors—the merits of plaintiff's substantive claims and the sufficiency of the complaint—are "often analyzed together." *Dr. JKL Ltd. V. HPC IT Educ. Ctr.*, 749 F. Supp. 2d 1038, 1048 (N.D. Cal. 2010). These factors require that a plaintiff's allegations in its complaint "state a claim on which the [plaintiff] may recover." *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978).

Here, the CFTC brings a single count against each of the Defaulting Defendants: fraud by deceptive device or contrivance in violation of section 6(c)(1) of the CEA, 7 U.S.C. § 9(a), and CFTC Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3). ECF 1 ¶¶ 76-81. The CFTC further alleges that each Defaulting Defendant aided and abetted each other's fraudulent acts and practices in violation of 7 U.S.C. § 9(1) and 8 C.F.R. § 180.1(a)

and are therefore liable for their co-Defendants' fraud pursuant to 7 U.S.C. § 13c(a). *Id.* ¶ 82.

a) Fraud by Deceptive Device or Contrivance

Section 6(c)(1) of the CEA and CFTC Regulation 180.1(a)(1)-(3) generally prohibit the use of a deceptive or misleading device in connection with a contract of sale of "any commodity in interstate commerce." 7 U.S.C. § 9(1); 17 C.F.R. § 180.1(a). Specifically, section 6(c)(1) of the CEA proscribes:

> [A]ny person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of [CFTC regulations].

7 U.S.C. § 9(1). CFTC Regulation 180.1(a) provides, in relevant part, that it shall be unlawful to:

> (1) [u]se or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) [m]ake, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or] (3) [e]ngage, or attempt to engage, in any act, practice or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

17 C.F.R. § 180.1(a). Thus, to state a violation of section 6(c)(1) of the CEA and CFTC Regulation 180.1(a)(1)-(3), the CFTC must show that Defaulting Defendants (1) engaged in prohibited conduct (i.e., employed a fraudulent scheme; made a material misrepresentation or omission; or engaged in a business practice that operated as a fraud); (2) in connection with a contract of sale of a commodity in interstate commerce, a swap, or a futures contract; (3) with scienter. *See, e.g.*, *Commodity Futures Trading Comm'n v. McDonnell*, 332 F. Supp.3d 641, 717 (E.D.N.Y. 2018) ("*McDonnell II*"); *U.S. Commodity*

*Futures Trading Comm'n v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317, 1347 (S.D. Fla. 2014); *see also U.S. Commodity Futures Trading Comm'n v. Monex Credit Co.*, 931 F.3d 966, 976 (9th Cir. 2019) (noting that section 6(c)(1) is a "mirror image of § 10(b) of the Securities Exchange Act," and that "by copying § 10(b)'s language and pasting it in the CEA, Congress adopted § 10(b)'s judicial interpretations as well"); *Gebhart v. S.E.C.*, 595 F.3d 1034, 1040, 1040 n.8 (9th Cir. 2010).

*First*, the CFTC must show that Defaulting Defendants engaged in prohibited conduct. "Whether a misrepresentation has been made depends on the overall message and the common understanding of the information conveyed." *Commodity Futures Trading Comm'n v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1328 (11th Cir. 2002) (citation and internal quotation marks omitted). "A representation or omission is 'material' if a reasonable investor would consider it important in deciding whether to make an investment." *Id.*; *McDonnell II*, 332 F. Supp. at 720. It is well-established that "[m]isrepresentations of profit and risk are material." *Commodity Futures Trading Comm'n v. Driver*, 877 F. Supp. 2d 968, 977 (C.D. Cal. 2012), *aff'd sub nom. Commodity Futures Trading Comm'n v. Driver*, 585 F. App'x 366 (9th Cir. 2014); *McDonnell II*, 332 F. Supp. at 720 ("Any fact that enables investors to assess the risk inherent in their investment and the likelihood of profit is material."); *Commodity Futures Trading Comm'n v. Int'l Fin. Servs. (New York), Inc.*, 323 F. Supp. 2d 482, 501 (S.D.N.Y. 2004) ("[M]isrepresentations concerning profit and risk go to the heart of a customer's investment decision and are therefore material as a matter of law." (citation omitted)).

Courts have also deemed material failures to disclose that investor funds are being used to pay commissions. *See, e.g.*, *S.E.C. v. All. Leasing Corp.*, No. 98-cv-1810-J, 2000 WL 35612001 (S.D. Cal. Mar. 20, 2000), *aff'd*, 28 F. App'x 648, 652 (9th Cir. 2002) ("We agree with the district court that the 30% commissions were so obviously important to an investor, that reasonable minds cannot differ on the question of materiality." (citation and internal quotation marks omitted)); *Sec. & Exch. Comm'n v. Lottonet Operating Corp.*, No. 17-21033-CIV, 2017 WL 6949289, at *14 (S.D. Fla. Mar. 31, 2017) ("Any reasonable

investor would want to know that Defendants were not, as Defendants represented, spending investor funds to develop the company, but were instead using 35 percent of investors' money to pay sales agents for soliciting their investments."), *R. & R. adopted by*, 2017 WL 6989148 (S.D. Fla. Apr. 6, 2017).

Moreover, "[m]isappropriation of customer funds constitutes fraud that violates Section 6(c)(1) of the [CEA] and [Regulation] 180.1(a)." *McDonnell II*, 332 F. Supp.3d at 719; *see also Driver*, 977 F. Supp. at 978 ("Misappropriation or diversion of funds entrusted to one for trading purposes is 'willful and blatant fraudulent activity' that clearly violates the [CEA]." (citation omitted)). Misappropriation involves the "[s]oliciting or obtaining funds from investors for trading, then failing to trade the funds while using them for personal and business expenses." *Driver*, 977 F. Supp. at 978 (citation omitted).

Here, the allegations in the Complaint establish that the overall message of the Icomtech scheme was that Defaulting Defendants and other Icomtech agents would use customer funds to trade Bitcoin and other digital asset commodities on behalf of customers, that Icomtech customers would achieve specific daily earnings, and that their money would be doubled in approximately four to eight months. ECF 1 ¶¶ 2, 34, 45-46, 49, 50, 54, 80.b. Defaulting Defendants falsely promised referral commissions and bonuses. *Id.* ¶¶ 4, 50, 54, 70-75. And they also failed to disclose in their promotional materials that customer funds would be used to further promote the scheme, cover personal expenses, and pay commissions and bonuses. *Id.* 3, 5, 58-59, 74-75. Each of these false representations and omissions were individually and collectively material because a reasonable investor would consider each important in deciding whether to invest. Moreover, the Complaint plausibly alleges that Defaulting Defendants misappropriated funds. *Id.* ¶¶ 3, 5-6, 58, 67, 74, 80. Thus, the CFTC has sufficiently alleged that Defaulting Defendants engaged in conduct prohibited by section 6(c)(1) of the CEA and CFTC Regulation 180.1(a).

*Second*, the CFTC must show that the fraud was "in connection with" a contract of sale of a commodity in interstate commerce, a swap, or a futures contract. The term "commodity" is defined by the statute to mean certain agricultural products and "all other

goods and articles . . . and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). Digital currencies are "encrypted, decentralized digital money based on blockchain technology" that "is created by developers and traded over the internet." *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1007 (9th Cir. 2023). Bitcoin assets underlie Bitcoin futures contracts listed for trading on the Chicago Mercantile Exchange ("CME"). ECF 82-2 ¶ 22. In a 2015 administrative decision, the CFTC found for the first time that "Bitcoin and other virtual currencies are encompassed in the definition and properly defined as commodities." *In the Matter of Coinflip, Inc.*, CFTC No. 15-29 (Sept. 17, 2015). District courts have affirmed the CFTC's authority to regulate digital assets as commodities under the CEA in cases involving fraud. *See, e.g.*, *Commodity Futures Trading Comm'n v. McDonnell*, 287 F. Supp. 3d 213 (E.D.N.Y.) ("*McDonnell I*") (holding that virtual currencies "fall well-within the common definition of 'commodity' as well as the CEA's definition of 'commodities' as 'all other goods and articles . . . in which contracts for future delivery are presently or in the future dealt in'"), *recons. denied*, 321 F. Supp. 3d 366 (E.D.N.Y. 2018); *Commodity Futures Trading Comm'n v. My Big Coin Pay, Inc.*, 334 F. Supp.3d 492, 495-98 (D. Mass. 2018) (finding that the CFTC had plausibly alleged that virtual currencies fall within the "general[] and categorical[]" definition of "commodity" under the CEA, and that such an interpretation gives effect to Congress' intent to "reasonably assure[] that the CEA's regulatory scheme and enforcement provisions will comprehensively protect and police the markets"). The Court therefore finds that the CFTC has plausibly alleged that digital assets such as Bitcoins are "commodities in interstate commerce" within the meaning of the CEA. ECF 1 ¶ 22.

"In interpreting the 'in connection with' requirement of the [CEA], courts generally look to interpretations of the 'in connection with' requirement of § 10(b) of the Securities Exchange Act." *Tatum v. Legg Mason Wood Walker, Inc.*, 83 F.3d 121, 123 n.5 (5th Cir. 1996) (citation omitted); *Hirk v. Agri-Research Council, Inc.*, 561 F.2d 96, 103-04 (7th Cir. 1977). In the securities context, the "in connection with" element is "read flexibly,

not technically and restrictively." *Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12 (1971); *Hirk*, 561 F.2d at 103-04 ("The plain meaning of such broad language [as 'in connection with'] cannot be ignored."). Likewise, "[t]he 'in connection with' requirement of Section 6(c)(1) of the [CEA] and [Regulation] 180.1(a) is construed broadly. It is satisfied where the contract of sale of a commodity is in interstate commerce and the fraud are not independent events." *McDonnell II*, 332 F. Supp. 3d at 722. It is enough that the scheme to defraud and the contract of sale of a commodity in interstate commerce merely coincide. *See S.E.C. v. Zandford*, 535 U.S. 813, 822 (2002).

Here, the Complaint alleges that Defaulting Defendants induced customers to provide them funds by telling them that the money would be used by Icomtech to trade Bitcoin and other digital asset commodities on their behalf and misrepresenting the rate of return on those investments. ECF 1 ¶¶ 2, 34, 35, 45-46, 49, 54. They each accepted or received customer funds for that purpose, either directly from customers or indirectly. *Id.* ¶¶ 61-63. This conduct satisfies the "in connection with" inquiry. *See McDonnell II*, 332 F. Supp. 3d at 723 (holding that "[d]efendants' fraudulent acts, including making material misrepresentations and omissions and misappropriating customer funds and virtual currencies, were in connection with, and contemporaneous with, contracts of sale of virtual currencies such as Bitcoin and Litecoin, each a commodity in interstate commerce"); *cf. Hunter Wise*, 21 F. Supp. 3d at 1347-48 (holding in a securities case, that "[a] defendant who accepted payment and then failed to deliver the security to a customer is liable under Rule 10b-5"); *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 361-63 (S.D.N.Y. 2011) (concluding that the requirement, broadly read pursuant to *Zandford*, can be met even in cases involving "completely fictitious" securities transactions).

*Lastly*, the CFTC must sufficiently show scienter. Scienter may be established either "by showing that the defendants knew their statements were false, or by showing that defendants were reckless as to the truth or falsity of their statements." *Gebhart*, 595 F.3d at 1041; Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41398-01,

41404 ("[A] showing of recklessness is, at a minimum, necessary to prove the scienter element of final Rule 180.1."). Recklessness is defined in CFTC Regulation 180.1 as "an act or omission that departs so far from the standards of ordinary care that it is very difficult to believe the actor was not aware of what he or she was doing." 76 Fed. Reg. at 41404 (citation and internal quotation marks omitted); *see also McDonnell II*, 332 F. Supp.3d at 721 ("The Commission can establish recklessness by showing that the conduct 'departs so far from the standards of ordinary care that it is very difficult to believe the [actor] was not aware of what he was doing.'" (quoting *First Commodity Corp. of Boston v. Commodity Futures Trading Comm'n*, 676 F.2d 1, 6-7 (1st Cir. 1982))); *R.J. Fitzgerald & Co., Inc.*, 310 F.3d at 1328 ("For purposes of fraud or deceit in an enforcement action, scienter is established if Defendant intended to defraud, manipulate, or deceive, or if Defendant's conduct represents an extreme departure from the standards of ordinary care.").

In securities fraud cases, the Ninth Circuit has held that a complaint sufficiently pleads scienter "by raising a strong inference that the defendant possessed actual knowledge or acted with deliberate recklessness." *New Mexico State Inv. Council v. Ernst & Young, LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011). This involves a two-party inquiry, where the court must first "determine whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter," and "second, if no individual allegation is sufficient, [it] conduct[s] a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.*

Here, the allegations in the Complaint sufficiently raise a "strong inference" of scienter. The Complaint alleges that notwithstanding their representations to the contrary, Defaulting Defendants in fact did not trade Bitcoin or other digital assets on behalf of their customers, did not earn daily returns of between .09% and 2.8%, or double the customers' investments through trading. ECF 1 ¶¶ 3, 57, 59, 60-69. Instead of trading, customers' funds were used to further the scheme, pay for personal expenses, and pay Icomtech agents' commissions and bonuses. *Id.* ¶¶ 3, 58-59, 67, 73. Customers complained to Carmona and

Valdez that they were unable to withdraw their funds but were nevertheless assured that their funds were safe. *Id.* ¶¶ 65-66. Defaulting Defendants also communicated amongst themselves about rates of return and how to handle customers' money. *Id.* ¶¶ 55-56. That Defaulting Defendants never in fact traded Bitcoin or other digital assets on behalf of solicited customers alone demonstrates that Defaulting Defendants were at a minimum reckless as to the truth of their statements. And a holistic review of the remaining allegations further satisfies the scienter inquiry. *See, e.g.*, *id.* ¶ 80.

b) Aiding and Abetting

Section 13(a) of the CEA provides: "Any person who commits, or who willfully aids, abets, counsels, commands, induces or procures the commission of, a violation of [the CEA and CFTC Regulations], or who acts in combination or concert with any other person in any such violation . . . may be held responsible for such violation as a principal." 7 U.S.C. § 13c(a). "A defendant will be found liable if [he] 'knowingly associates [himself] with an unlawful venture, participates in it to bring it about, and seeks by [his] actions to make it succeed." *Hunter Wise*, 21 F. Supp. 3d at 1348 (citation omitted).

The Complaint alleges that Defaulting Defendants, jointly doing business as Icomtech, each aided and abetted the others in the fraudulent conduct alleged. ECF 1 ¶¶ 1, 8, 26, 34, 56, 59, 75, 80, 82. Defaulting Defendants communicated with each other regarding the rates of return, solicitation materials, and the handling of customer money. *Id.* ¶ 55. They engaged in the fraudulent solicitation of customers and accepted customer funds. *Id.* ¶¶ 2, 34, 35, 45-46, 49, 54, 61-63. And they coordinated their solicitation activities. *Id.* ¶ 56. The CFTC has sufficiently alleged aiding and abetting liability against each Defaulting Defendant.

***3. Sum of Money at Stake***

The fourth *Eitel* factor balances "the amount of money at stake in relation to the seriousness of [d]efendant's conduct." *PepsiCo*, 238 F. Supp. 2d at 1176. "When a large sum of money is at stake in a default judgment, this factor weighs in favor of the

defendant." *Millennium Films, Inc. v. Robinson*, 2017 WL 8221952, at *4 (C.D. Cal. Feb. 15, 2017) (citing *Eitel*, 782 F.2d at 1472).

The CFTC seeks $1,098,920 in victim restitution, jointly and severally, and a $1,000,000 civil monetary penalty as to each Defaulting Defendant. ECF 82 at 21, 34, 37-43. Defaulting Defendants' violations of the anti-fraud provisions of the CEA undermine a core purpose of the statute to "protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets." 7 U.S.C. § 3(b). As explained below, the imposition of civil monetary penalties and restitution is authorized by the CEA and Regulations. The CFTC further contends that "the restitution amount is directly tied to Icomtech customer victims," ECF 82 at 34, and the civil monetary penalty amount is "reasonable in light of the conduct," *id*. The Court agrees that the amount at stake, while large, is equitable and proportionate to the seriousness of Defaulting Defendants' conduct. *See, e.g.*, *U.S. Commodity Futures Trading Comm'n v. Am. Bullion Exch. ABEX Corp.*, No. SACV 10-1876-DOC-RNB, 2014 WL 12603558, at *4, *11 (C.D. Cal. Sept. 16, 2014) (finding on a default judgment, that the CFTC's "statutorily driven and equitable remedies" in an amount exceeding $14 million were proportionate to the defendants' violations); *U.S. Commodity Futures Trading Comm'n v. Safevest, LLC*, No. SACV 08-00474-JVS-MLG, 2009 WL 2448116, at *2, 4-5 (C.D. Cal. July 13, 2006) (entering default judgment for the CFTC and ordering, among other things, restitution of $17.8 million, and a civil monetary penalty of $1 million per defendant).

### *4. Possibility of Dispute Concerning Material Facts*

The fifth *Eitel* factor assesses the possibility of dispute between the parties as to any material facts in the case. *Eitel*, 782 F.2d at 1472. "[U]pon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *Geddes*, 559 F.2d at 560. Where "a plaintiff's complaint is well-pleaded and the defendant makes no effort to properly respond," courts have concluded that "the likelihood of disputed facts is very low." *Alpargatas USA, Inc. v. Flopstore LLC*, No. CV 21-6063-GW-PVCx, 2022 WL 1843134, at *5 (C.D. Cal. Mar. 25, 2022) (quoting *United States v.*

*Yermian*, No. SACV 15-0820-DOC-RAO, 2016 WL 1399519, at *3 (C.D. Cal. Mar. 18, 2016)); *compare PepsiCo*, 238 F. Supp. 2d at 1177 (holding that there can be no dispute of material facts where defendant did not appear and default had been entered against defendant) *with Fox v. Delgado*, No. 11-CV-0419-JAM-AC, 2013 WL 6843600, at *6-7 (E.D. Cal. Dec. 20, 2013) (where defendant had appeared in the action, considering defendant's deposition testimony in deciding whether there was a possible dispute over material facts).

As discussed above, the CFTC has sufficiently pleaded its claims. *See* Section III.C.2., *supra*. Defaulting Defendants have not appeared in this action, and, apart from Brend, they have made no effort to respond. Brend's stricken Appearance of Counsel appears to raise certain disputes of fact and defenses, *see* ECF 35, but Brend did not attempt to refile an answer to the Complaint or respond to the instant Motion. Therefore, with all facts resolved in the CFTC's favor, there can be no genuine dispute of material facts that would preclude default judgment.

***5. Whether Default Due to Excusable Neglect***

The sixth factor considers whether the defendant's default is the result of excusable neglect. *Eitel*, 782 F.2d at 1472. Although there is always some theoretical possibility that a defendant may claim excusable neglect, this factor favors default judgment where a defendant was "properly served with the Complaint, the notice of entry of default, as well as the papers in support of the instant motion." *Alpargatas*, 2022 WL 1843134, at *6 (quoting *Shanghai Automation Inst. Co., Ltd. v. Kuei*, 194 F. Supp. 2d 995, 1005 (N.D. Cal. 2001)).

The record contains no evidence of excusable neglect. Defendants were properly served with the Summons and Complaint and failed to appear or respond. *See* ECF 20, 21, 22, 23, 56; *see Landstar Ranger, Inc. v. Parth Enters., Inc.*, 725 F. Supp. 2d 916, 922 (C.D. Cal. 2010) (finding excusable neglect factor favored entry of default judgment where defendant did not appear after being properly served). That Brend improperly filed an acknowledgement of receipt of the Complaint and Summons only confirms his awareness

of this case and rules out excusable neglect as to him. *See* ECF 32. The Court finds that this factor weighs in favor of default judgment.

***6. Policy Favoring Decisions on the Merits***

Although "cases should be decided upon their merits whenever reasonably possible," *Eitel*, 782 F.2d at 1472, "the mere existence of [Rule] 55(b) indicates that this preference, standing alone, is not dispositive," *PepsiCo*, 238 F. Supp. 2d at 1177 (citation and quotation marks omitted). The Court recognizes that Defaulting Defendants' failure to answer has made a judgment on the merits "impractical, if not impossible." *Id*. In such circumstances, this factor does not warrant denial of default judgment.

***

Accordingly, the Court finds that the *Eitel* factors, taken together, support granting default judgment against Defaulting Defendants.

**D. Remedies and Damages**

"A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c); *see also Fong v. United States*, 300 F.2d 400, 413 (9th Cir. 1962); *Elektra Ent. Grp., Inc. v. Crawford*, 226 F.R.D. 388, 393 (C.D. Cal. 2005). Here, the CFTC seeks a permanent injunction, restitution, and civil monetary penalties, which is consistent with the relief demanded in its Complaint. *Compare* ECF 82 at 35-40 *and* ECF 1 at 26-29.

***1. Permanent Injunction***

Section 6c(a) of the CEA authorizes a district court to grant permanent injunctive relief. 7 U.S.C. § 13a-1(a). To obtain a permanent injunction, the CFTC "need not establish irreparable harm or inadequate remedy at law, as would a private litigant." *Driver*, 977 F. Supp. 2d at 981 (citation omitted). Instead, it is "entitled to a permanent injunction upon a showing that a violation [of the CEA or CFTC Regulations] has occurred and is likely to continue unless enjoined." *Id*. "[O]nce a violation of the [CEA] has been shown, the moving party need only show the existence of some reasonable likelihood of future violations." *Commodity Futures Trading Comm'n v. Main and Prospect Capital,*

*LLC*, No. 2:19-cv-09736-FLA-AFM, 2022 WL 17666395, at *6 (C.D. Cal. Aug. 22, 2022) (citation omitted).

"The court may infer a likelihood of future violations of the [CEA] and Regulations from past unlawful and systematic conduct." *Id.*; *see also Driver*, 877 F. Supp. 2d at 981. In drawing such an inference from past violations, the court "should look at the totality of the circumstances, and factors suggesting that the infraction might not have been an isolated occurrence are always relevant." *Driver*, 877 F. Supp. at 981. The court may also consider "the egregiousness of the defendant's actions, whether the violation was isolated or recurrent, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of his conduct's wrongfulness, and the likelihood that the defendant's occupation will present opportunities for future violations." *Id.* at 981-82.

Defaulting Defendants fraudulently solicited and defrauded at least 190 customers and obtained over $1,098,920 in customer funds. Notwithstanding their representations, they did not in fact trade Bitcoin or other digital asset commodities on behalf of customers, did not earn the promised daily returns, and did not double the customers' money from trading. This fraudulent scheme was not based on isolated occurrences; rather, Defaulting Defendants engaged in egregious and systematic acts to defraud customers. From this pattern of past misconduct, the Court infers a likelihood of future wrongdoing.

The CFTC seeks an injunction prohibiting Defaulting Defendants from committing any future violations of section 6(c) of the CEA and Regulation 180.1. ECF 82 at 36; ECF at 26. A general "obey the law" injunction "framed in language almost identical to the statutory mandate" is permissible so long as "the statutory terms adequately describe the impermissible conduct." *United States v. Miller*, 588 F.2d 1256, 1261 (9th Cir. 1978); *Cf. F.T.C. v. EDebitPay, LLC*, 695 F.3d 938, 944 (9th Cir. 2012) ("[W]e have not adopted a rule against 'obey the law' injunctions per se." (citing *Miller*, 588 F.2d at 1261)).

In addition, the CFTC seeks permanent trading and registration bans against Defaulting Defendants. ECF 82 at 36; ECF 1 at 26-27. Such prohibitions are generally

appropriate "where there is a nexus between the violation and the integrity of the futures market." *Reddy v. Commodity Futures Trading Comm'n*, 191 F.3d 109, 127 (2d Cir. 1999). "[F]raud is one of the primary threats to market integrity." *United States Commodity Futures Trading Comm'n v. Crombie*, No. 11-cv-04577-CW, 2019 WL 3403591, at *3 (N.D. Cal. June 5, 2019). Given the egregious nature of the fraud and the threat posed to market integrity, the Court finds that permanent trading and registration bans are appropriate as to Defaulting Defendants.

***2. Restitution, Civil Monetary Penalties, and Post-Judgment Interest***

Because allegations as to the amount of damages are not taken as true on a motion for default judgment, "the plaintiff is required to provide proof of all damages sought in the complaint." *PepsiCo*, 238 F. Supp. 2d. at 1175. "When 'proving-up' damages, admissible evidence (including witness testimony) supporting . . . damage calculations is usually required." *Amini Innov. Corp. v. KTY Int'l Mktg.*, 768 F. Supp. 2d 1049, 1054 (C.D. Cal. 2011).

a) <u>Restitution</u>

Section 6c(d)(3)(A) of the CEA authorizes the Commission to seek, and the Court to impose, equitable remedies for violations of the CEA, including "restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses)." 7 U.S.C. § 13a-1(d)(3)(A). "The purpose of restitution is to restore the status quo and return the parties to the positions they occupied before the transactions at issue occurred." *Driver*, 977 F. Supp. 2d at 981. The amount of restitution is therefore calculated as "the difference between what defendants obtained and the amount customers received back, but payment to customers that exceeded this principal should not be included in this calculation." *Id.*

Here, as set forth in the Declaration of Kara L. Mucha, at least 190 Icomtech customers have incurred net losses totaling $1,098,920. ECF 82-2 ¶¶ 10-14, 19-21. Attached to the Declaration as Exhibit 1 is a document entitled "Icomtech Customer Names and Amounts Invested," providing a detailed breakdown by customer of amounts invested

and withdrawn, as well as the information sources for that data. *Id.* ¶ 14, Ex. 1. The net loss amount of $1,098,920 reflects the total principal amount of funds transferred by the customers, less any funds withdrawn. *Id.* ¶¶ 19-21. The Court therefore finds that the evidence supports an order of restitution in the amount of $1,098,920, jointly and severally.[3]

b) Civil Monetary Penalties

Section 6c(d)(1) of the CEA, 7 U.S.C. § 13a-1(d)(1), together with CFTC Regulation 143.8(b)(1), 17 C.F.R. § 143.8(a)(b)(1) (2023), authorize civil monetary penalties of up to the greater of triple the defendants' monetary gain or $221,466 per violation. "[A] high civil monetary penalty is warranted where customers have been defrauded of a substantial amount of money." *Driver*, 877 F. Supp. at 982. "Civil monetary penalties are also exemplary; they remind both the recipient of the penalty and other persons subject to the Act that noncompliance carries a cost." *Id.* at 983 (citation omitted).

The CFTC seeks a civil monetary penalty of $1 million as to each Defaulting Defendant. ECF 82 at 40. As explained above, Defaulting Defendants, jointly doing business as Icomtech, each acting with scienter and aiding and abetting each other, defrauded at least 190 customers of $1,098,920.00, and used customer funds for Defaulting Defendants' collective benefit. As the CFTC notes, the amount in civil monetary penalties requested—approximately reflecting a single multiplier of the monetary gain—is far below the amount pursuable under the statute. *See id.* at 40, 40 n.14. Given the seriousness of Defaulting Defendant's conduct, the number of victims defrauded, and the amount of loss,

[3] The CFTC anticipates that restitution will be ordered against Defaulting Defendants in the parallel criminal proceedings in the United States District Court for the Southern District of New York. ECF 82 at 39 n.12. Arellano Parra has already entered into a consent preliminary forfeiture of $1,744,474.00, and Ruiz Ochoa into a consent preliminary forfeiture of $914,000.00. ECF 82-1 ¶¶ 32, 38. In the event restitution is ordered in the criminal case, the Court agrees with the CFTC that any award for restitution entered in this case should contain a provision allowing for a dollar-for-dollar credit for any restitution ordered and collected in the criminal case.

the Court deems $1 million against each Defaulting Defendant to be an appropriate civil monetary penalty in this case. The Court therefore grants the CFTC's request that Defaulting Defendants each pay a civil monetary penalty of $1 million for their violations of the CEA and CFTC Regulations.

c) Post-Judgment Interest

The CFTC is entitled to post-judgment interest on any restitution and civil monetary penalty awards ordered by the Court. *See* 28 U.S.C. § 1961(a).

## III. CONCLUSION

For the foregoing reasons, the Motion is **GRANTED**. The Court further **ORDERS** the entry of Judgment in favor of the CFTC and against Defaulting Defendants David Carmona, Juan Arellano Parra, Moses Valdez, and David Brend as follows:

### A. Permanent Injunction

1. Based upon and in connection with the foregoing conduct, pursuant to 7 U.S.C. § 13a-1, Defaulting Defendants are each, individually, permanently restrained, enjoined and prohibited from directly or indirectly, in connection with any contract of sale of any commodity in interstate commerce, intentionally or recklessly: (1) using or employing, or attempting to use or employ, manipulative devices, schemes, or artifices to defraud; (2) making, or attempting to make, any untrue or misleading statements of material fact or omissions of material fact; or (3) engaging, or attempting to engage, in acts, practices, or courses of business, which operate or would operate as a fraud or deceit upon any person, in violation of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2023).

2. Defaulting Defendants are each also, individually, permanently restrained, enjoined, and prohibited from:

a. Trading on or subject to the rules of any registered entity (as that term is defined by 7 U.S.C. § 1a(40));

b. Entering into any transactions involving "commodity interests" (as that term is defined in 17 C.F.R. § 1.3) or digital asset commodities as

described herein, including Bitcoin, for accounts held his name or for any account in which he has a direct or indirect interest;

c. Having any commodity interests or digital asset commodities, including Bitcoin, traded on his behalf;

d. Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests or digital asset commodities, including Bitcoin;

e. Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests or digital asset commodities, including Bitcoin;

f. Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9) (2023); and

g. Acting as a principal (as that term is defined in 17 C.F.R. § 3.1(a) (2023)), agent, or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38)), registered, exempted from registration, or required to be registered with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9).

**B. <u>Restitution</u>**

3. 7 U.S.C. § 13a-1(d)(1)(A) authorizes the Commission to seek and a court to impose "restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses)."

4. Defaulting Defendants' violations of the CEA and Regulations as charged merit the award of restitution. Accordingly, Defaulting Defendants shall pay, jointly and severally, restitution in the amount of one million one hundred and fifteen thousand and

twenty dollars ($1,098,920.00) ("Restitution Obligation"), representing losses to the 190 persons, which were proximately caused by the violations described above.

5. The Restitution Obligation will be deemed satisfied by the entry of an order in the Criminal Action that requires Defaulting Defendants, or any one of them, to pay a criminal forfeiture judgment and/or restitution in an amount equal to or greater than the Restitution Obligation.

6. If, however, restitution is not awarded in the Criminal Action, or if the amount awarded in the Criminal Action does not fully cover the amount of the Restitution Obligation, any remaining Restitution Obligation balance shall be paid pursuant to the procedures set forth below.

7. Defaulting Defendants shall receive a dollar-for-dollar credit against the Restitution Obligation for any restitution or disgorgement paid in the Criminal Action. Within ten (10) days of any payment of any restitution or disgorgement in the Criminal Action, or ten (10) days after the date of entry of the Consent Order, whichever is later, the Defaulting Defendant that made a payment in the Criminal Action shall, under a cover letter that identifies the name and docket number of this proceeding, transmit copies of the form of payment in the Criminal Action to the Chief Financial Officer, Commodity Futures Trading Commission, and Rick Glaser, Deputy Director, Commodity Futures Trading Commission, at 1155 21st Street, NW, Washington, D.C. 20581.

8. If not offset by payments in the Criminal Action, any outstanding portion of Defaulting Defendants' Restitution Obligation will be subject to post-judgment interest, which shall accrue on the unpaid portion of the Restitution Obligation beginning ten (10) days after the date of entry of any order of restitution or disgorgement in the Criminal Action, or ten (10) days after the date of entry of the Consent Order, whichever is later, and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961.

9. The amounts payable to each Icomtech customer shall not limit the ability of any customer from proving that a greater amount is owed from Defaulting Defendants or

any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any customer that exist under state or common law.

10. To the extent that any funds accrue to the U.S. Treasury for satisfaction of Defaulting Defendants' Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth below.

11. To effect payment of any of Defaulting Defendants' outstanding Restitution Obligation (i.e., any remaining Restitution Obligation not deemed satisfied and/or offset), and the distribution of any payments to customers, the Court appoints the National Futures Association ("NFA") as Monitor ("Monitor"). The Monitor shall receive payments on the Restitution Obligation from Defaulting Defendants and make distributions as set forth below. Because the Monitor is acting as an officer of this Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

12. Defaulting Defendants shall make their Restitution Obligation's payments, and any post-judgment interest payments, under this Consent Order to the Monitor in the name of the "Carmona, Arellano Parra, Valdez and Brend Restitution Fund" and shall send such payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or bank money order, to the Office of Administration, National Futures Association, 320 South Canal Street, 24th Floor, Chicago, Illinois 60606 under cover letter that identifies the Defaulting Defendant making the payment and the name and docket number of this proceeding. The Defaulting Defendant making the payment shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

13. The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to the customers identified by Plaintiff or may defer distribution until such time as the Monitor deems appropriate. In the event that the amount of the Restitution Obligation

payments to the Monitor are of a de minimis nature such that the Monitor determines that the administrative cost of making a distribution to eligible customers is impractical, the Monitor may, in its discretion, treat such payments as civil monetary penalty payments, which the Monitor shall forward to the CFTC.

14. Defaulting Defendants shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify the customers to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments. Defaulting Defendants shall execute any documents necessary to release funds that they hold in any repository, bank, investment, or other financial institution, wherever located, in order to make partial or total payment toward the Restitution Obligation.

15. The Monitor shall provide Plaintiff at the beginning of each calendar year with a report detailing the disbursement of funds to customers during the previous year. The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

16. The Monitor shall provide Plaintiff at the beginning of each calendar year with a report detailing the disbursement of funds to customers. The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

17. Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each customer who suffered a loss is explicitly made an intended third-party beneficiary of this Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of the Restitution Obligation that has not been paid by Defaulting Defendants to ensure continued compliance with any provision of this Order and to hold Defaulting Defendants in contempt for any violations of any provision of this Order.

C. **Civil Penalty**

18. Section 6c(d)(1)(A) of the CEA, 7 U.S.C. § 13a-1(d)(1)(A), authorizes the Commission to seek and the Court to impose a CMP of not more than the greater of triple the monetary gain to the person or $100,000 (adjusted for inflation to $221,446 pursuant to Regulation 143.8(a) and (b)(1), 17 C.F.R. § 143.8(a), (b)(1) (2023), as amended 89 Fed. Reg. 4544 (Jan. 24, 2024)), for each violation of the CEA and Regulations.

19. The Court finds that, based on Defaulting Defendants' intentional and egregious conduct, a civil monetary penalty of one million dollars ($1,000,000) ("CMP Obligation") as to each Defaulting Defendant, individually, is warranted.

19. Accordingly,

a. Carmona shall pay a civil monetary penalty in the amount of $1,000,000 ("Carmona CMP Obligation"). If the Carmona CMP Obligation is not paid in full immediately, then post-judgment interest shall accrue on the unpaid portion of the Carmona CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

b. Arellano Parra shall pay a civil monetary penalty in the amount of $1,000,000 ("Arellano Parra CMP Obligation"). If the Arellano Parra CMP Obligation is not paid in full immediately, then post-judgment interest shall accrue on the unpaid portion of the Arellano Parra CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

c. Valdez shall pay a civil monetary penalty in the amount of $1,000,000 ("Valdez CMP Obligation"). If the Valdez CMP Obligation is not paid in full immediately, then post-judgment interest shall accrue on the unpaid portion of the Valdez CMP Obligation beginning on the date of entry of this Order

and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

d. Brend shall pay a civil monetary penalty in the amount of $1,000,000 ("Brend CMP Obligation"). If the Brend CMP Obligation is not paid in full immediately, then post-judgment interest shall accrue on the unpaid portion of the Brend CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

20. Defaulting Defendants shall pay their respective CMP Obligations and any post-judgment interest by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

MMAC/ESC/AMK326
Commodity Futures Trading Commission
6500 S. MacArthur Blvd. HQ Room 266
Oklahoma City, OK 73169
9-amz-ar-cftc@faa.gov

If payment by electronic funds transfer is chosen, the Defaulting Defendant making such payment shall contact Tonia King or her successor at the address above to receive payment instructions and shall fully comply with those instructions. The Defaulting Defendant making such payment shall accompany payment of their CMP Obligation with a cover letter that identifies the paying Defaulting Defendant and the name and docket number of this proceeding. The Defaulting Defendant making the payment shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

**D. Miscellaneous**

21. Partial Satisfaction: Acceptance by the CFTC, or the Monitor, of any partial payment of the Restitution Obligation or CMP Obligations shall not be deemed a waiver of Defaulting Defendants' obligation to make further payments pursuant to this Order, or a waiver of the CFTC's right to seek to compel payment of any remaining balance.

22. Until such time as Defaulting Defendants satisfy in full their Restitution and CMP Obligations under this Order, upon the commencement by or against any of Defaulting Defendants of insolvency, receivership or bankruptcy proceedings, or any other proceedings for the settlement of any of Defaulting Defendants' debts, all notices to creditors required to be furnished to the Commission under Title 11 of the United States Code or other applicable law with respect to such insolvency, receivership bankruptcy or other proceedings, shall be sent to the address below:

Secretary of the Commission
Office of the General Counsel
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street N.W.
Washington, DC 20581

23. Notice: All notices required to be given by any provision in this Order shall be sent by certified mail, return receipt requested, as follows:

**Notice to Commission:**
Rick Glaser
Deputy Director, Division of Enforcement
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, DC 20581

All such notices to the CFTC shall reference the name and docket number of this action.

24. Invalidation: If any provision of this Order or if the application of any provision or circumstance is held invalid, then the remainder of this Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

25. Continuing Jurisdiction of this Court: This Court shall retain jurisdiction of this action to ensure compliance with this Order and for all other purposes related to this action, including any motion by any Defaulting Defendant to modify, or for relief from, the terms of this Order.

26. Injunctive, Statutory and Equitable Relief Provisions: The injunctive, statutory equitable relief provisions of this Order shall be binding upon each Defaulting Defendant, upon any person under his authority or control, and upon any person who receives actual notice of this Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with any Defaulting Defendant.

The Court hereby **ORDERS** the Clerk to enter this Order for Default Judgment, Permanent Injunction, Restitution, Civil Penalties, and Other Equitable Relief against Defendants David Carmona, Juan Arellano Parra, Moses Valdez, and David Brend forthwith and without further notice.

**IT IS SO ORDERED.**

Dated: October 21, 2024

HON. MÓNICA RAMÍREZ ALMADANI
UNITED STATES DISTRICT JUDGE